UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
RODNEY BRADSHAW,               )
                               )
           Plaintiff,          )
                               )
     v.                        )          Civil Action No. 04-1422 (PLF)
                               )
THOMAS J. VILSACK,             )
  Secretary, United States     )
  Department of Agriculture,[1] )
                               )
           Defendant.          )
_____)
```

OPINION

In 2004, Rodney Bradshaw brought suit against the United States Department of

Agriculture alleging, among other things, that the Farm Service Agency had discriminated

against him on the basis of race in violation of the Equal Credit Opportunity Act, 15

U.S.C. § 1691 et seq., in connection with a loan application he submitted in 2002.  The matter

came before the Court for a bench trial on July 31, 2018; it continued for five full days.  Counsel

for the plaintiff called the following witnesses to testify at trial:  Rodney Bradshaw, the plaintiff;

Dr. Thomas Elam, an expert witness on agricultural economics, agricultural management,

business planning and financial planning; and Alicia Balthazar, a paralegal at Hogan Lovells,

who served as a summary witness with respect to the loan files of assertedly similarly situated

white farmers.

---

[1]        Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court
substitutes as defendant the current Secretary of the United States Department of Agriculture,
Thomas J. Vilsack, for former Secretary Sonny Perdue.

Counsel for the defendant, the Secretary of the United States Department of Agriculture ("USDA"), sued in his official capacity, called the following Farm Service Agency employees as witnesses at trial:  Arlyn Stiebe, Farm Loan Chief for the State of Kansas; Michael Campbell, District Director for Northwest Kansas; Mark Hendrickson, District Director for South Central Kansas; and Dwight Jurey, Farm Loan Manager for the Oakley, Kansas office.

After the trial had concluded, the parties filed proposed findings of fact and conclusions of law.  Upon careful review of the testimony of the witnesses at trial and the exhibits admitted at trial, and having considered the applicable statutes, regulations and case law, the Court finds that the plaintiff has not met his burden to prove that he was discriminated against with respect to a credit transaction on the basis of race.  It therefore enters judgment for the USDA.

## I.  FINDINGS OF FACT

### A.  Background

#### 1.  The Farm Service Agency

1.  The Farm Service Agency ("FSA") was created in 1994 as a successor to the Farmers Home Administration ("FmHA").  See Pub. L. No. 103-354, 108 Stat. 3209 (Oct. 13, 1994); Pigford v. Glickman, 182 F.R.D. 341, 343 (D.D.C. 1998).  There are two main divisions of FSA:  the Program Division and the Farm Loan Division.  Trial Tr. at 452:22-453:4 (Stiebe).  The Program Division deals with non-loan programs that help farmers manage market risk, recover from disasters, and conserve and protect natural resources, such as commodity programs, price support programs, and other types of government payments.  Id. at 452:22-453:2 (Stiebe).  The Farm Loan Division provides various kinds of loans to farmers, including farm ownership loans and operating loans.  Id at 453:2-4; 458:17-25 (Stiebe).

2.   Implementation of FSA programs is largely conducted by state and county offices.  See CAROL CANADA, CONG. RSCH. SERV., R40179, FARM SERVICE AGENCY COMMITTEES: IN BRIEF 1 (2021).  Each state office is led by a State Executive Director, who oversees FSA's operations in that state.  Id.  The State Executive Director supervises the state office staff, as well as District Directors located around the state, who in turn each oversee a portion of county offices in the state.  See Trial Tr. at 454:16-455:16 (Stiebe) (distinguishing between county offices and District Directors overseeing those offices).

3.   At the county level, FSA programs are overseen by the County Committee, which carries out an array of administrative functions.  Farm programs are implemented by the County Executive Director, who is employed by the County Committee.  Farm loan programs are implemented by the Farm Loan Manager, who makes and services loans to farmers and ranchers in a designated area.  See CAROL CANADA, CONG. RSCH. SERV., R40179, FARM SERVICE AGENCY COMMITTEES: IN BRIEF 3 (2021); Trial Tr. at 661:14-19 (Jurey).  Several counties may share one County Executive Director and one Farm Loan Manager.

4.   Both the County Executive Director and the Farm Loan Manager report to the District Director for their region.  See Trial Tr. at 455:19-25 (Stiebe); id. at 733:13 (Jurey).  Each state office also has a Farm Loan Chief, who provides advice to the Farm Loan Managers but is not in their supervisory chain of command.  See id. at 456:12-457:22 (Stiebe); id. at 907:25-908:5 (defense closing argument).

5.   FSA rules govern whether a loan or loan-servicing application may be approved by a Farm Loan Manager or whether the Farm Loan Manager instead makes a recommendation for final decision by the District Director or state office staff.  See U.S. DEP'T

OF AGRIC., FSA HANDBOOK: GENERAL PROGRAM ADMINISTRATION, 1-FLP (Rev. 1) at 2-20

(2020); Trial Tr. at 478:9-17 (Stiebe); id. at 737:25-738:1 (Jurey).

2.  Loan Applications

6.  Farm ownership loans are loans made for the purchase or improvement of real

estate.  Trial Tr. at 458:17-21 (Stiebe); 7 C.F.R. § 1943.16 (2002).[2]  Operating loans are loans

made for the purchase of machinery and equipment, livestock, facilities, and annual operating

expenses, such as fuel, fertilizer, seed, and feed.  Trial Tr. at 458:17-25 (Stiebe); 7 C.F.R.

§ 1941.16.  Farm ownership and farm operating loans can be "direct loans," whereby FSA makes

a loan directly to a borrower and also services the loan.  Trial Tr. at 457:24-458:2 (Stiebe).  They

may also be "guaranteed loans," whereby FSA guarantees a loan made by another lender.  Id.

at 458:3-6, 19-25 (Stiebe); see 7 C.F.R. § 762.101.   FSA also can make direct emergency loans

that may be used for various purposes.  See 7 C.F.R. §§ 1945.151, 1945.166.

7.  Farmers who wish to apply for a loan from FSA must submit a written

application, 7 C.F.R. § 1910.3(a), and must submit various supporting documents and

information in order for the application to be considered complete, 7 C.F.R. § 1910.4(b).  "The

loan approval official must approve or disapprove applications within 60 days after receiving a

complete application."  7 C.F.R. § 1941.33(c).

8.  In addition to submitting a written application, an applicant must meet

eligibility criteria as set forth in the relevant regulations.  See 7 C.F.R. § 1941.12(a) (farm

operating loan eligibility criteria); id. § 1943.12(a) (farm ownership loan eligibility criteria);

id. § 762.120 (guaranteed loan eligibility criteria).  Among other things, applicants must not be

---

[2]        Unless otherwise noted, this opinion cites to the 2002 version of the relevant
portions of the Code of Federal Regulations.

delinquent on any federal debt in order to be granted new federal loans.  See 31

U.S.C. § 3720B(a).  Accordingly, an applicant is ineligible for an FSA loan unless any such

delinquency is resolved at or before the closing of the new loan.  7 C.F.R. §§ 1941.12(a)(11),

1943.12(a)(11).  Applicants may also be rendered ineligible for federal loans if there are

non-federal delinquencies on the applicant's credit report.  See id. § 1910.5(c) (stating that

"non-payment of a debt due to circumstances within an applicant's or borrower's control may be

used as an indication of unacceptable credit history").

       9.  For borrowers whose FSA loan payments are delinquent, FSA is required to

collect other government payments by administrative offset.  See 7 C.F.R. § 1951.101; 31

U.S.C. § 3716.

       10.  If an applicant meets basic loan eligibility criteria, FSA must then determine

whether the proposed loan is based on a feasible plan and whether the security or collateral is

adequate.  7 C.F.R. § 1941.33(b)(1)(iii)-(iv); see J. Ex. 7 (stating that approval of a loan is

subject to eligibility and satisfactory cash flow).[3]  A "feasible plan" is "a plan based upon the

applicant/borrower's records that show the farming operation's actual production and expenses."

Id. § 1941.4.  To assist in developing a feasible plan, FSA uses a Farm and Home Plan system

"to evaluate loan feasibility and prospects for achieving financial viability."  Id. § 1924.56.  A

Farm and Home Plan is a document prepared by the Farm Loan Manager that lists the borrower's

expenses, income, and projections for the upcoming year.  See J. Ex. 9; Trial Tr. at 72:2-4

(Bradshaw).  The plan includes a balance sheet that lists the value of all farm assets.  See, e.g.,

J. Ex. 11 at B001466-67.

---

     [3]     "P. Ex __ " refers to exhibits offered by the plaintiff and admitted in evidence; "D. Ex __ " refers to exhibits offered by the defendant and admitted in evidence; and "J. Ex. __ " refers to exhibits offered jointly by the parties and admitted in evidence.

11.   FSA also provides loan servicing options to borrowers, including subordination, disaster set-asides, and primary loan servicing.  When FSA grants a subordination, it subordinates its mortgage to allow a private creditor to use the secured property as new collateral.  See 7 C.F.R. § 1965.12.  Under the Disaster Set-Aside Program, borrowers may be permitted to move one annual payment of an FSA loan to the end of the loan term if a borrower located in a designated disaster area is not able to make the payment as scheduled.  Id. § 1951.952.  And primary loan servicing is available to financially distressed or delinquent borrowers who are not able to make their payments.  See id. § 1951.901 et seq.

12.   If a borrower becomes delinquent but fails to apply for primary loan servicing, FSA is required to proceed with a notice of intent to accelerate the delinquent loan. See 7 C.F.R. § 1951.907(e).  Acceleration makes the entire debt due and payable immediately. See id. § 1955.15(d)(2).

### 3.   Rodney Bradshaw

13.   Plaintiff Rodney Bradshaw is an African American farmer who lives in Jetmore, a small farming community in Hodgeman County in southwest Kansas.  Trial Tr. at 34:10-35:1 (Bradshaw).  He has farmed his own land in southwest Kansas since 1974 or 1975. Id. at 35:11-16, 20-24 (Bradshaw).  Mr. Bradshaw received a farm ownership loan in 1979 from the FmHA, which he used to purchase eighty acres of land.  See id. at 35:22-24 (Bradshaw); D. Ex. 87 at B001648.  Mr. Bradshaw also received loans from FSA in 1979, 1995, and 1996.  See D. Ex. 87 at B001648; Second Amended Complaint ("2d Am. Compl.") [Dkt. No. 133] ¶¶ 15, 17, 18.  By 2002, Mr. Bradshaw and his wife, Mrs. Arzella Bradshaw, were farming approximately 2,500 acres, on which they reared cattle and raised crops including wheat, milo, and sorghum.  Trial Tr. at 36:23-37:20 (Bradshaw); see P. Ex. 5.

14.  Mr. Bradshaw testified that his family is the only African American family in Jetmore, Kansas, Trial Tr. at 43:14-16 (Bradshaw), and that he and his wife are the only African American farmers in Jetmore, id. at 43:17-19 (Bradshaw).

15.  Mr. Bradshaw claims that FSA discriminated against him on the basis of his race in connection with his efforts to obtain a farm loan in 2002, in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 et seq.  See 2d Am. Compl. ¶¶ 31-36.

16.  As an African American, Mr. Bradshaw is a member of a protected class under ECOA.  Stip. No. 5; 15 U.S.C. § 1691(a) (stating that it is unlawful to discriminate against any applicant, with respect to any aspect of a credit transaction, on the basis of race).[4]

17.  Over the years, Mr. Bradshaw filed a number of administrative civil rights complaints against FSA employees.  See Trial Tr. at 577:24-578:9 (Campbell); id. at 715:9-11 (Jurey); 2d Am. Compl. ¶¶ 16, 20.  He also filed a claim in the Pigford class action case concerning events that occurred before 2002.  See generally Pigford v. Glickman, 185 F.R.D. 82 (1999).  He was a Track A claimant in Pigford.  See id. at 95-98 (describing the Track A dispute resolution mechanism); D. Ex. 51 at B011128.

18.  Based on his understanding that the Pigford settlement would include debt forgiveness, in 1998 Mr. Bradshaw stopped making payments on his pre-2000 FSA loans, and has not made a voluntary payment since.  Stip. Nos. 49-50; Trial Tr. at 144:3-20 (Bradshaw).

19.  Mr. Bradshaw submitted his Track A claim under the Pigford settlement in 1999.  See D. Ex. 51 at B011127.  His claim was denied in 2000.  D. Ex. 56.  He filed a petition for monitor review, D. Ex. 58, which remained pending until January 2007 when the

---

[4]      "Stip. No." refers to the parties' joint stipulations of fact.  See Revised Joint Pretrial Statement [Dkt. No. 228].

monitor ordered reexamination, D. Ex. 63.  Upon reexamination with additional evidence, Mr.

Bradshaw's Track A claim was denied again in January 2008.  See D. Ex. 166.

20.   Mr. Bradshaw was a minority advisor on the FSA County Committee for

Hodgeman County for a period of between six and eight years.  In that role, he attended monthly

meetings and monitored the County Committee's activities.  Trial Tr. at 53:22-54:15, 55:10-11

(Bradshaw).  Mr. Bradshaw testified that he was the only African American individual on the

County Committee and the only person without voting power.  Id. at 54:16-18, 56:12-20

(Bradshaw).

21.   Before June 2002, Mr. Bradshaw's FSA program file was handled by Becky

Cramer, the County Executive Director for Hodgeman County, who was supervised by Mark

Hendrickson.  Trial Tr. at 46:12-20 (Bradshaw); id. at 595:21-596:2 (Hendrickson); Stip. No. 13.

22.   In May 2002, Mr. Bradshaw talked to Arlyn Stiebe, the Farm Loan Chief for

Kansas, about having his loan file transferred away from the office overseen by Mr.

Hendrickson.  Trial Tr. at 49:4-50:2 (Bradshaw); id. at 514:4-21 (Stiebe).

23.   The state office transferred Mr. Bradshaw's borrower files to its Logan

County office in Oakley, Kansas, effective June 3, 2002.  Stip. No. 53; D. Ex. 3.  The transfer

decision was made by the Kansas State Director based on the recommendation of Mr. Stiebe.

Trial Tr. at 467:6-468:1, 514:4-13 (Stiebe); id. at 663:10-664:14 (Jurey).

24.   When Mr. Bradshaw applied for loans after June 3, 2002, he worked with

Dwight Jurey, the Farm Loan Manager in the Oakley FSA office.  Trial Tr. at 45:23-25, 48:18-23

(Bradshaw); see id. at 780:21-24 (Jurey).

25.   In addition to FSA, Mr. Bradshaw worked with private lenders including

Farm Credit of Ness City, Hanston State Bank, and Fidelity State Bank.  Trial Tr. at 60:10-61:6.

4.  Procedural History

26.  Mr. Bradshaw filed this lawsuit in August 2004.  See Complaint [Dkt. No. 1];
Amended Complaint [Dkt. No. 5].  In 2005, he sought leave to file a second amended complaint,
which the Court granted.  See 2d Am. Compl [Dkt. No. 133].  Because of difficulties arising
from the conduct of Mr. Bradshaw's original counsel, Mr. James Myart, Jr., the lawsuit was
delayed for a substantial period of time.[5]  After Mr. Myart's application to renew his
membership in the bar of this Court was denied in late 2007, Mr. Bradshaw proceeded pro se
until April 2013, when the Court appointed attorneys from the law firm of Hogan Lovells as pro
bono counsel to represent Mr. Bradshaw.  Bradshaw v. Vilsack, Civil Action No. 04-1422, 2013
WL 1716502, at *1 (D.D.C. Apr. 18, 2013).

27.  Mr. Bradshaw's second amended complaint asserted three claims.  First, he
alleged that he applied for an FSA loan in 2002 but did not receive that loan because of his
race.  2d Am. Compl. ¶¶ 21, 31-36.  Second, Mr. Bradshaw alleged that in 2004, FSA
discouraged him from applying for any additional loans, also because of his race.
Id. ¶¶ 22, 31-36.  Finally, Mr. Bradshaw alleged that in 2005 he was similarly discouraged with
respect to his application for a real estate subordination loan because of his race.
Id. ¶¶ 23, 31-36.

28.  After discovery was completed, the USDA filed a motion for summary
judgment, which the Court granted in part and denied in part.  Bradshaw v. Vilsack, 102
F. Supp. 2d 327, 328 (D.D.C. 2015).  The Court granted summary judgment for the USDA on
the second and third claims, but it denied summary judgment on the first claim.  Id. at 334.  The

---

[5]       The troubled history of Mr. Myart's involvement in this case is more fully
recounted in this Court's previous opinions.  See Bradshaw v. Vilsack, 286 F.R.D. 133, 137-39
(D.D.C. 2012); Hildebrandt v. Veneman, 233 F.R.D. 183 (D.D.C. 2005).

case therefore went to trial only on the claim that Mr. Bradshaw's 2002 loan application was not approved on the basis of his race.

### B. Mr. Bradshaw's Interactions with FSA Personnel from 2002 to 2005

#### 1. Dwight Jurey

29.   Dwight Jurey has been the Farm Loan Manager in the Logan County FSA office since 1988.  Stip. No. 7.  In that capacity, he supervised a small office with between one and three employees.  Trial Tr. at 661:10-18 (Jurey).

30.   From 1999 to 2013, Mr. Jurey reported to and was supervised by District Director Michael Campbell.  Stip. No. 8; Trial Tr. at 550:17-23 (Campbell).  During that time, Mr. Jurey received several outstanding performance ratings.  Trial Tr. at 552:1-4 (Campbell). Mr. Jurey's supervisors said that Mr. Jurey was well organized, kept on top of things, and ran a very good office.  Id. at 478:18-22 (Stiebe).  Mr. Jurey maintained borrower records under the system set out in FSA guidance documents.  Id. at 552:12-18, 554:2-12 (Campbell); id. at 664:16-24, 665:7-666:7 (Jurey).  Mr. Jurey also served FSA as a trainer for other farm loan managers.  Id. at 551:17-22 (Campbell).

#### 2. Initial Interactions between Mr. Bradshaw and Mr. Jurey

31.   Upon receiving Mr. Bradshaw's file in June 2002, Mr. Jurey reviewed the file to determine what had occurred recently and what steps he needed to take pursuant to FSA regulations.  See J. Ex. 25 at B000453; Trial Tr. at 666:10-667:7 (Jurey).  Mr. Jurey testified that from the date the file was transferred to him, he kept a "running record" of his analysis of the file and application information, his conversations with Mr. Bradshaw, and his interactions with Mr. Bradshaw's private lenders.  See Trial Tr. 8/3/2018 at 665:4-18 (Jurey); J. Ex. 25.  Mr. Bradshaw

testified that Mr. Jurey's running record was inaccurate in many respects. See Trial Tr. at 102:17-103:17; 106:3-9 (Bradshaw).

32.   Because the Oakley FSA office is approximately two hours away from Jetmore, Mr. Bradshaw and Mr. Jurey normally would communicate by telephone and mail. Trial Tr. at 46:4-5; 50:3-15 (Bradshaw).  When Mr. Bradshaw and Mr. Jurey were working on a loan application, they would speak on the phone regularly, as often as three or four times a week. Their communications were less frequent when Mr. Bradshaw did not have a pending loan application.  Id. at 50:16-20 (Bradshaw); P. Ex. 3A.

33.   The file shows that on April 17, 2002, the Ness City FSA office, which previously had been responsible for Mr. Bradshaw's file, sent Mr. Bradshaw Exhibit A of Form 1951-S.  That form notifies a borrower who has become past due on his loans that primary loan servicing is available.  See J. Ex. 25 at B000453; Trial Tr. at 667:9-13 (Jurey).  The file also shows that Mr. Bradshaw did not submit an application for primary loan servicing, and his time to apply for that service expired on July 12, 2002.  See J. Ex. 25 at B000453; Trial Tr. at 667:14-19 (Jurey).

34.   Although the next step required by FSA regulations was a Notice of Intent to Accelerate, see 7 C.F.R. § 1951.907(e), Mr. Jurey sent Mr. Bradshaw a letter, dated July 22, 2002, outlining ways FSA might assist Mr. Bradshaw even though he had missed his opportunity to apply for primary loan servicing.  See J. Ex. 25 at B000453; Trial Tr. at 667:25-668:6 (Jurey).  When Mr. Jurey received no response from Mr. Bradshaw, he sent Mr. Bradshaw a Notice of Intent to Accelerate on August 6, 2002, stating that Mr. Bradshaw's FSA loans were delinquent by $26,855.95.  D. Ex. 60; Trial Tr. at 668:7-669:18 (Jurey).

35.   On October 23, 2002, Mr. Bradshaw called Mr. Stiebe about applying for a real estate subordination loan, and Mr. Stiebe told Mr. Bradshaw to contact Mr. Jurey.  Mr. Bradshaw contacted Mr. Jurey by telephone on October 24, 2002.  J. Ex. 25 at B000452; Trial Tr. at 672:12 (Jurey).  During their phone call, Mr. Bradshaw expressed interest in applying for a real estate subordination loan from FSA in order to enable Farm Credit of Ness City to make a new loan.  He asked Mr. Jurey to contact Farm Credit on his behalf.  J. Ex. 25 at B000452; Trial Tr. at 672:9-673:2 (Jurey).  Mr. Jurey sent the real estate subordination loan application forms to Mr. Bradshaw the same day, partially completing the forms based on their conversation.  J. Ex. 25 at B000452; Stip. No. 16.  He also called Farm Credit on Mr. Jurey's behalf.  J. Ex. 25 at B000446; Trial Tr. at 673:13-15 (Jurey).

36.   On October 25, 2002, Mr. and Mrs. Bradshaw signed an application for direct loan assistance with FSA, which can come in the form of an operating loan or an emergency loan.  J. Ex. 1 at B001837; Trial Tr. at 52:16-53:5 (Bradshaw); Trial Tr. at 682:4-17 (Jurey).  They also signed an application for a real estate subordination loan.  J. Ex. 2 at B001250; Trial Tr. at 59:12-22, 62:4-8 (Bradshaw).  They did not mail those documents on that date.

37.   Mr. Bradshaw testified that he wanted the direct loan assistance and the real estate subordination because they were going to make his financial situation better by enabling him to restructure his debt so that his loans were current and he could obtain a better cash flow on his farm.  Trial Tr. at 53:10-17, 61:23-62:3, 300:12-22; 302:5-22, 304:16-22; 310:17-25 (Bradshaw); J. Exs. 1-2.

38.   On October 28, 2002, Mr. Bradshaw called Mr. Jurey and they discussed Mr. Bradshaw's delinquency with regard to previously-issued FSA loans.  Mr. Bradshaw informed Mr. Jurey that he wanted to resolve this delinquency without making payments because he was

concerned that doing so might reduce the amount that would be written off if he prevailed in his Pigford claim.  J. Ex. 25 at B000451.  Mr. Jurey explained some ways that the delinquency could be addressed, including disaster set-asides, emergency loans, and subordinations.  He sent Mr. Bradshaw forms necessary to apply for disaster set-aside and an emergency loan.  See id.

39.  On October 29, 2002, Mr. Jurey received Notice FLP-279, a notice regarding loan programs that directed loan officers to ensure that Pigford claimants with delinquent FSA loans receive an additional primary loan servicing opportunity immediately after their Pigford claim was finally resolved.  J. Ex. 44 at B001838-39; Trial Tr. at 786:5-11, 829:19-830:11 (Jurey).  Mr. Jurey emailed Mr. Stiebe that same day, explaining that he was reviewing Notice FLP-279 and asking about the status of Mr. Bradshaw's Pigford claim.  He inquired about how he would be informed when the Pigford monitor issued a final decision on Mr. Bradshaw's claim or referred it back to the adjudicator for reexamination.  P. Ex. 12.

40.  While Mr. Bradshaw's Pigford claim was pending, it was FSA policy to put primary loan servicing processes on hold until a decision on the claim was made.  In other words, FSA would not move to accelerate Mr. Bradshaw's delinquent loans until the Pigford claim was resolved.  Trial Tr. at 505:21-507:12 (Stiebe); id. at 710:10-22, 711:3-4 (Jurey).

### 3.  Mr. Bradshaw's 2002 Loan Application

#### a.  Submitting the Application

41.  In November 2002, Mr. Bradshaw submitted two applications to Mr. Jurey: an application for a real estate subordination and an application for direct loan assistance, both of which he had signed on October 25.  J. Exs. 1, 2; Trial Tr. at 66:2-6 (Bradshaw); see also J. Ex. 25 at B000450-51; J. Ex. 13 (stating that Mr. Bradshaw had applied for an emergency loan).

42.  On January 14, 2003, Mr. and Mrs. Bradshaw signed an application for disaster set-aside.  J. Ex. 5; Trial Tr. at 66:10-23 (Bradshaw).  That application was received by FSA on January 28, 2003.  J. Ex. 5.[6]

43.  Mr. Jurey assisted Mr. Bradshaw in completing the 2002 application.  He repeatedly informed Mr. Bradshaw of the information that was missing from the application.  D. Ex. 1 at 1-2; J. Ex. 16.  He also told Mr. Bradshaw that in addition to the completed application, Mr. Bradshaw needed to provide a list of creditors and amounts owed and a signed Farm and Home Plan.  Trial Tr. at 680:16-20 (Jurey); J. Ex. 25 at B000449.

44.  Mr. Jurey reviewed Mr. Bradshaw's credit report.  He could not tell from the face of the credit report whether the non-FSA delinquencies listed on the report were valid.  See J. Ex. 25 at B000423, B000446.  Even though, under FSA regulations, it was Mr. Bradshaw's responsibility to resolve any discrepancies on his credit report, Mr. Jurey further investigated the accounts shown as past due.  J. Ex. 16 at B001669; J. Ex. 25 at B000423.  Any delinquencies on the credit report would otherwise have made Mr. Bradshaw ineligible for loans.  Trial Tr. at 789:11-14 (Jurey); see also 7 C.F.R. § 1910.5(c).

45.  Mr. Bradshaw's application for direct loan assistance was received complete by FSA on February 14, 2003.  Stip. No. 19; J. Ex. 6.

46.  As of February 18, 2003, Mr. Bradshaw's delinquency on previously-issued FSA loans totaled over $45,000.  D. Ex. 5.  Mr. Jurey sent Mr. Bradshaw a letter on February 18, 2003, outlining a strategy to resolve Mr. Bradshaw's delinquency.  Id.  Mr. Jurey suggested using a mix of disaster set-asides, an emergency loan, and a private loan to bring the

---

[6]     The three applications submitted by Mr. Bradshaw in 2002 and 2003 – for direct loan assistance, a subordination, and a disaster set-aside, will collectively be referred to herein as the "2002 application."

payments current, after which Mr. Bradshaw could apply for primary loan servicing to address

an additional payment of approximately $46,000 that would be coming due in October 2003.  Id.

47.  In this letter, Mr. Jurey specifically noted that Mr. Bradshaw had said he did

not want to refinance his FSA loans because he did not want to "give up possible benefits if [his]

outcome in the class action case is reversed."  D. Ex. 5 at B001698.  In response to this concern,

Mr. Jurey suggested an "outside the box" idea – the use of a private loan to bring the delinquent

FSA debt current, along with a new FSA loan of approximately the same amount to ensure that

Mr. Bradshaw's FSA balance did not substantially decrease.  Id.

48.  On February 25, 2003, Mr. Jurey sent a letter to Mr. Bradshaw "certify[ing]

that [Mr. Bradshaw's] application for Farm Service Agency (FSA) loan assistance was received

complete on February 14, 2003."  J. Ex. 6.  On March 4, 2003, Mr. Jurey sent a letter to Mr.

Bradshaw confirming that he met the basic eligibility requirements direct loan assistance in the

form of an operating loan and an emergency loan, subject to the ability to show adequate security

and satisfactory cash flow that demonstrated ability to repay loans.  J. Ex. 7; Trial Tr.

at 681:19-682:3, 683:2-10 (Jurey).  This did not mean that Mr. Bradshaw's delinquency had been

resolved or had become irrelevant.  Trial Tr. at 682:19-683:1 (Jurey); see Stip. No. 37

(confirming that, as of April 2003, Mr. Bradshaw continued to have four outstanding loans with

FSA).

### b.  Mr. Jurey's Initial Efforts to Develop a Feasible Plan

49.  As of March 2003, Mr. Bradshaw had sixteen outstanding farm loans with

Hanston State Bank.  Stip. No. 33.  All of those loans were fully due in 2003.  It was Hanston

State Bank's practice with Mr. Bradshaw, however, to accept partial payment on each loan and

then roll the unpaid balance over to a new loan – even though the terms of the loan agreements

did not require this practice.  See, e.g., Stip. Nos. 33(f), 33(g), 39, 43 (series of rolled-over balances); Trial Tr. at 118:22-119:5, 208:18-22 (Bradshaw).

50.   In telephone calls on February 11 and March 11, 2003, Mr. Jurey discussed proposals with Hanston State Bank officials.  J. Ex. 25 at B000438, B000440.  On one call, a bank official stated that Mr. Bradshaw had too much short-term debt with the bank.  Id. at B000438.  On another call, a bank official stated that the bank hoped FSA and/or Farm Credit of Ness City could refinance about $100,000 of Mr. Bradshaw's debt for a longer term.  Id. at B000439.  Mr. Jurey stated that he would consider using part of FSA's proposed emergency loan for such refinancing.  Id. at B000440.

51.   In order to approve Mr. Bradshaw's 2002 application, Mr. Jurey needed to find a positive cash flow.  J. Ex. 7; Trial Tr. at 69:19-70:8 (Bradshaw); Trial Tr. at 459:4-17 (Stiebe).  As of March 12, 2003, Mr. Jurey had found a negative cash flow of $32,109.  J. Ex. 8; Trial Tr. at 70:5-25 (Jurey).

52.   Mr. Jurey repeatedly conferred by phone, fax, and letter with each of Mr. Bradshaw's major creditors to discuss ways to create a feasible plan for restructuring Mr. Bradshaw's debts so that he could demonstrate satisfactory cash flow.  D. Ex. 1 at 1-4; J. Ex. 25 at B000440, B000446.

53.   In March 2003, Mr. Bradshaw and Mr. Jurey were talking four or five times a week about Mr. Bradshaw's 2002 application and what needed to be done to arrive at a positive cash flow.  Trial Tr. at 72:10-15 (Bradshaw); Stip. No. 20.  Mr. Bradshaw promptly and affirmatively provided Mr. Jurey with additional information regarding the application.  See J. Ex. 25 at B000435.  Mr. Jurey input the information from Mr. Bradshaw's balance sheet and from their telephone calls into the Farm and Home Plan.  Trial Tr. at 683:11-684:22 (Jurey).

54. On March 12, 2003, Mr. Jurey sent Mr. Bradshaw a letter with the initial draft of the Farm and Home Plan for him to review, identifying the assumptions on which he had based the proposal. He asked for Mr. Bradshaw's input. J. Exs. 8, 9. He also sent a similar letter to Farm Credit of Ness City. D. Ex. 6.

55. After completing this initial draft, Mr. Jurey discovered that an emergency loan he had initially proposed might not serve Mr. Bradshaw's purposes because agency regulations would require the emergency loan to be paid off within a few months. Mr. Jurey therefore adapted the proposal by replacing the emergency loan with an operating loan. J. Ex. 25 at B000433-434. This loan could not be used to make the past due FSA payments, but it could be used to refinance the short-term debt at Hanston State Bank. See D. Ex. 5 (explaining that emergency loans are the only FSA loans that can be used to make payments on other FSA loans).

56. After further conversations with Mr. Bradshaw by telephone, Mr. Jurey sent Mr. Bradshaw a letter on March 19, 2003, answering some questions posed by Mr. Bradshaw. J. Ex. 10. On March 20, 2003, Mr. Jurey sent Mr. Bradshaw a letter and attached an updated draft of the Farm and Home Plan. J. Ex. 11-12.

57. On March 31, 2003, Mr. Jurey travelled to Jetmore to visit Mr. Bradshaw at his farm. J. Ex. 25 at B000431. On the way, he stopped in Ness City to meet with Mr. Eldon Pfannenstiel at Farm Credit of Ness City regarding Mr. Bradshaw's application. Id. That afternoon, Mr. Jurey and Mr. Bradshaw met with Hanston State Bank officials regarding Mr. Bradshaw's application. J. Ex. 25 at B000428-30.

58. At the March 31, 2003 meeting with Hanston State Bank, Mr. Bradshaw stated that he did not want a direct operating loan from FSA secured by machinery because, if

FSA took first position on that collateral, Mr. Bradshaw was concerned it would reduce Hanston State Bank's flexibility in working with him.  J. Ex. 25 at B000428; Trial Tr. at 688:6-14 (Jurey).

59.  To accommodate Mr. Bradshaw's concerns about collateral, Mr. Jurey again modified the proposed loan package, replacing the proposed direct operating loan from FSA with a guaranteed loan with interest assistance from Hanston State Bank.  Trial Tr. at 806:18-25 (Jurey).  Such a loan would have left the collateral with Hanston State Bank.  Id. at 807:23-808:2 (Jurey).  FSA would have guaranteed the loan against loss and provided a four percent subsidy of the interest, reducing the effective rate paid by Mr. Bradshaw to an amount similar to what he would have paid on a direct loan from FSA.  Id. at 808:11-18 (Jurey).

60.  On April 2, 2003, Mr. Bradshaw called Mr. Jurey, who explained the option of a guaranteed loan with interest assistance.  Mr. Bradshaw said he did not understand some of Mr. Jurey's proposals and wanted to have someone look things over for him.  J. Ex. 25 at B000425.  The next day, Mr. Stiebe sent an email to Mr. Jurey stating:  "I want to commend you for all of the effort you have put into this case to try and find a workable solution.  I think you've done everything possible to help the Bradshaws."  D. Ex. 8.

61.  Despite his best efforts, Mr. Jurey could not develop a feasible plan to achieve a positive cash flow and resolve Mr. Bradshaw's delinquency by the time the 60-day period for a decision on Mr. Bradshaw's completed application had expired.  See 7 C.F.R. § 1941.33(c).  Mr. Bradshaw's calculated expenses, including loan payments due each year, exceeded his calculated income.  J. Ex. 13; J. Ex. 11 at B001465 (calculating that Mr. Bradshaw could only pay 97.83% of the amount due in 2003).

62.  On April 10, 2003, Mr. Jurey sent a letter to Mr. Bradshaw stating that, because the 60-day decision period had expired and he had not yet been able to project a positive

cash flow, he had to formally deny the 2002 application.  J. Ex. 13 at B001674-75.  He notified

Mr. Bradshaw of his rights to seek reconsideration and to appeal.  Id. at B001675.  Despite this

formal denial, Mr. Jurey also stated in the letter in bold:  "However, be assured that I will

continue to work with you and your other lenders with the goal of putting together a feasible

financing package.  If everyone involved is flexible, I think we are close to accomplishing this."

Id. at B001674.

63.   In the April 10, 2003 letter, Mr. Jurey noted that the denial did not address

certain programs that he and Mr. Bradshaw had discussed, including primary loan servicing and

guaranteed operating loans with interest assistance, "because you have not applied for them."

Mr. Jurey stated:  "[A]s we continue looking for a way to restructure your finances, I will

consider these programs."  J. Ex. 13 at B001675.

64.   Mr. Jurey and Mr. Bradshaw spoke by telephone on April 11, 2003.  Mr.

Jurey explained what was in the denial letter.  He also advised Mr. Bradshaw that he would keep

working toward developing a feasible plan to develop a positive cash flow.  In that call, Mr.

Bradshaw stated that he preferred a guaranteed loan with interest assistance over a direct

operating loan from FSA.  J. Ex. 25 at B000425.

### c.  Mr. Jurey Develops a Feasible Plan

65.   On April 18, 2003, Mr. Jurey sent a letter to Mr. Bradshaw outlining a

feasible plan – a complicated restructuring involving FSA and three of Mr. Bradshaw's private

lenders.  J. Ex. 15; J. Ex. 25 at B000424.  This plan, he explained, could resolve the delinquency

and provide a positive cash flow.  J. Ex. 15 at B001673.  Mr. Jurey enclosed with the letter a

revised Farm and Home Plan showing the positive cash flow.  See J. Ex. 14; Trial Tr.

at 75:10-13, 78:7-18, 79:9-17 (Bradshaw); id. at 772:15-25 (Jurey).  The letter stated that Mr.

Bradshaw needed to "provide a copy of [his] 2002 tax return or other income & expense statement" and instructed him to sign the Farm and Home Plan and return it to the Oakley FSA office. J. Ex. 15 at B001671. With Mr. Bradshaw's permission, Mr. Jurey also sent copies of this letter to the three private lenders – Farm Credit of Ness City, Hanston State Bank, and Fidelity State Bank. See J. Ex. 15 at B001673. The April 18, 2003 letter did not rescind the April 10 denial.

66. The plan set forth in the April 18, 2003 letter included a proposal to restructure Mr. Bradshaw's existing debt and issue two new loans – one from Farm Credit of Ness City and a second from Hanston State Bank. J. Ex. 15 at B001672. The Farm Credit loan would have been secured by property owned by Mr. Bradshaw, and FSA would have issued a subordination so that Farm Credit had the first position lien on this collateral. Id.; Trial Tr. at 692:3-5 (Jurey). The Farm Credit loan would have been used to refinance past due FSA payments along with certain debts at Farm Credit and Hanston State Bank. J. Ex. 15 at B001672; Trial Tr. at 690:22-691:6 (Jurey). The Hanston State Bank loan would have been an operating loan guaranteed by FSA. Trial Tr. at 691:9-15 (Jurey). As part of the transaction, FSA would also have issued an interest assistance subsidy to reduce the interest rate by four percent so that Hanston State Bank could refinance its short-term loans to Mr. Bradshaw over seven years. J. Ex. 15 at B001672. The plan would have further involved Hanston State Bank extending the terms for a non-farm loan and applying for and receiving a guaranteed loan with interest assistance from FSA. Trial Tr. at 691:9-15, 692:7-11 (Jurey). And it would have involved Fidelity State Bank reamortizing the debt Mr. Bradshaw had at that bank in order to reduce payments. Id. at 692:12-16 (Jurey).

67. The loan package Mr. Jurey proposed on April 18, 2003 would have involved other actions by FSA, including issuing disaster set-asides for payments on two of FSA's existing loans and preparing to conduct primary loan servicing after the FSA loans were brought current in order to reamortize one of the existing FSA loans.  J. Ex. 15 at B001671.

68. Upon reviewing the Farm and Home Plan attached to Mr. Jurey's April 18, 2003 letter, Mr. Bradshaw noticed that Mr. Jurey had omitted one of his three rental properties from the balance sheet.  Trial Tr. at 85:17-21 (Bradshaw); see J. Ex. 14 at B001437.  On April 22, 2003, Mr. Bradshaw called Mr. Jurey to inform him that the proposal failed to list his rental farmstead among his non-farm assets.  Trial Tr. at 86:19-23 (Bradshaw); J. Ex. 25 at B000423.

69. After confirming that the rental farmstead was not included in the appraisal recently received from Hanston State Bank, Mr. Jurey called Mr. Bradshaw back the same day.  They discussed what the estimated value of the farmstead should be, and Mr. Jurey said that he would correct the balance sheet.  Mr. Jurey also said that he would wait a day or two before revising the Farm and Home Plan in case Mr. Bradshaw found anything else that needed to be changed.  J. Ex. 25 at B000423.

70. In this second call on April 22, 2003, Mr. Bradshaw raised an issue regarding FSA's use of his credit report, stating that he thought FSA should have known that certain debts were not legally valid and that Mr. Jurey's research of those claims delayed processing of his application.  Mr. Jurey explained that FSA's actions had actually expedited processing of the application. J. Ex. 25 at B000423.

71. On April 23, 2003, Mr. Jurey sent a letter to Mr. Bradshaw apologizing for the fact that "due to miscommunication about an appraisal" one of his rental houses had been left

off the balance sheet in the Farm and Home Plan of April 18, 2003.  He further stated:  "I wouldn't want you to sign a balance sheet you think is inaccurate."  J. Ex. 16 at B001668. Mr. Jurey further explained how the non-farm real estate value in the Farm and Home Plan was developed and responded to Mr. Bradshaw's concern about use of information from Mr. Bradshaw's credit report.  Id. at B001668-69.  Mr. Bradshaw received the April 23, 2003 letter. Trial Tr. at 86:24-88:25 (Bradshaw).

72.  Mr. Jurey also reminded Mr. Bradshaw in the April 23, 2003 letter that FSA needed his "2002 income and expense information" to continue processing his Disaster Set-Aside application, and he stated that Mr. Bradshaw would need to "work with Hanston State Bank regarding a Guaranteed Loan with Interest Assistance."  J. Ex. 16 at B001669.

73.  On April 24, 2003, Mr. Jurey sent a letter to Mr. Bradshaw regarding his loan balances and the administrative offset notices sent to him in 2002.  J. Ex. 25 at B000422; D. Ex. 86.

74.  On April 24, 2003, Mr. Jurey also sent an email to Mr. Stiebe and Mr. Campbell describing his conversations with Mr. Bradshaw on April 22, 2003 and attaching a copy of his April 23, 2003 letter.  Mr. Jurey explained:  "I felt it was important to answer Rod's concerns in writing in case of future review by a third party.  In drafting the attached letter, I tried to state our position clearly but without being unnecessarily confrontational."  J. Ex. 20; Stip. No. 21.  Mr. Stiebe responded by email.  He stated:  "I think your letter is worded perfectly. It states the facts and is non confrontational."  J. Ex. 18; Stip. No. 22.  He also said:  "On one hand I can't believe that Rod wants to make an issue of the asset not listed on the financial statement but on the other hand, it figures."  Id.

75.  On April 25, 2003, Mr. Jurey sent Mr. Bradshaw a letter with the corrected and revised Farm and Home Plan.  J. Exs. 17, 21; Trial Tr. at 88:20-89:5, 91:8-17; 92:7-9 (Bradshaw); Stip. No. 23.  The corrected Farm and Home Plan included Mr. Bradshaw's rental house that Mr. Jurey inadvertently had omitted.  See J. Ex. 21 at B001409.  It was an accurate depiction of Mr. Bradshaw's non-farm real estate at that time.  Trial Tr. at 92:10-24 (Bradshaw).

76.  Mr. Jurey explained in the April 25, 2003 letter that FSA "need[s] the signed 'Farm & Home Plan' prior to approving a subordination and Disaster Set Aside."  J. Ex. 17.  The letter urged Mr. Bradshaw to "[p]lease review it for accuracy.  Sign & return it if you find it acceptable."  Id.  The letter also reminded Mr. Bradshaw that FSA needed a copy of his 2002 tax return or other income and expense statement.  Id.

77.  Mr. Bradshaw testified that he had received the April 25, 2003 letter and that it stated that he needed to provide Mr. Jurey with a copy of his 2002 tax return or other income and expense statement, as well as a signed copy of the Farm and Home Plan.  Trial Tr. at 79:18-80:1 (Bradshaw).

78.  Mr. Bradshaw also testified that after receiving the April 25, 2003 letter, both he and his wife signed and dated the corrected Farm and Home Plan and that he mailed it to FSA.  Trial Tr. at 97:1-19 (Bradshaw).  He did not send it by certified mail, but instead used a stamp and mailed it through the U.S. Postal Service.  Id. at 97:20-98:3 (Bradshaw).  He could not remember the exact date on which he mailed the Farm and Home Plan, but he stated that "[i]t wouldn't have been too long after we got it."  Id. at 98:11 (Bradshaw).  Mr. Bradshaw further testified that he mailed his 2002 tax return to Mr. Jurey within one week of filing it with the IRS, either between April 7 and April 14 or between April 14 and April 20.  Id. at 90:15-17, 100:21-101:4 (Bradshaw).  He testified that he sent the tax return in the same manner as the

Farm and Home Plan – with a stamp and mailed through the U.S. Postal Service.  Id. at 90:4-11
(Bradshaw).  Mr. Bradshaw does not believe he retained copies of the documents he mailed to
Mr. Jurey, id. at 161:23-162:2 (Bradshaw), and no such signed copies were produced in
discovery or offered in evidence.

79.  Mr. Bradshaw called Mr. Jurey on April 25, 2003 to ask for an accounting of
payments made on his loans because he thought his FSA loan balance was too high, considering
the amount of payments made by administrative offset.  J. Ex. 25 at B000421.  Mr. Jurey
responded to this request for an accounting of loan balances and offsets by letter on
April 28, 2003.  D. Ex. 87.

80.  Mr. Bradshaw testified on cross-examination that he had many telephone
conversations with Mr. Jurey after April 25, 2003, Trial Tr. 153:1-12 (Bradshaw), and the
records reflect that they spoke a total of at least eighteen times, Stip. Nos. 57, 59.  But Mr.
Bradshaw testified that he did not think he ever asked Mr. Jurey about the pending 2002
application.  Trial Tr. at 153:17-19 (Bradshaw).  He testified:  "I would assume that if he didn't
have something he was needing, he would have brought it up in a phone conversation."  Id.
at 153:24-154:1 (Bradshaw).  In response to being asked whether, after April 25, 2003, he had
ever told Mr. Jurey on the phone that he had signed and returned the Farm and Home Plan
and 2002 tax return, he stated: "I don't think I did.  I don't think so."  Id. at 154:4-7 (Bradshaw).

81.  On April 28, 2003, Mr. Jurey sent Mr. Bradshaw a letter and attached a Farm
Assessment for his signature.  D. Ex. 11; see also D. Ex. 10.  A Farm Assessment is a "tool to
help [FSA and the borrower] understand the farming operation."  Trial Tr. at 701:3-12 (Jurey).
Mr. Jurey testified that the Farm Assessment should be completed and signed prior to loan
closing.  Id. at 701:13-15 (Jurey).  He testified that if the Farm Assessment was not signed prior

to loan closing, he "would probably have it signed at closing if it wasn't completed before then." Id. at 701:15-17 (Jurey).  He also testified that he "[w]ould not deny a loan" because there wasn't a signed Farm Assessment.  Id. at 820:11-13 (Jurey).  The Farm Assessment sent to Mr. Bradshaw on April 28, 2003 included the same proposed loan restructuring plan set out in Mr. Jurey's April 18, 2003 letter.  D. Ex. 10 at B001398-400.  His April 28, 2003 letter did not state that a signed Farm Assessment was required to receive a loan.  See D. Ex. 11.  Mr. Bradshaw testified that Mr. Jurey never told him that he had to sign the Farm Assessment in order to get the loan.  Trial Tr. at 105:18-20 (Bradshaw).

### d.  Mr. Bradshaw Turns to Other Matters

82.  On April 29, 2003, Mr. Bradshaw called Mr. Jurey and stated that he was scheduled to meet with an attorney the following week and that he wanted to have the attorney review the Farm and Home Plan before he would sign it.  J. Ex. 25 at B000421; Trial Tr. at 473:11-25 (Stiebe).  Mr. Bradshaw also said that he and his attorney would be talking with FSA's national office about events over the last six years and that the papers Mr. Jurey had sent him might not even be needed after the meeting.  J. Ex. 25 at B000421.  Mr. Jurey asked Mr. Bradshaw to contact him after his meeting with the attorney so that Mr. Jurey could know what direction to take on his application.  Id.

83.  On April 30, 2003, Mr. Jurey sent an email to Mr. Stiebe and Mr. Campbell summarizing his conversation with Mr. Bradshaw on April 29, 2003.  Mr. Jurey wrote that Mr. Bradshaw had stated that he was scheduled to meet with an attorney the following week and wanted to have his attorney review the Farm and Home Plan before he signed it.  Mr. Jurey wrote:  "Of course I have no problem with that."  J. Ex. 19; Trial Tr. at 557:4-12 (Campbell).  He also reported that Mr. Bradshaw said that he and his attorney would be talking with FSA's

25

national office and that it was possible the papers FSA had worked up would not even be needed

after the meeting.  J. Ex. 19.  Mr. Jurey concluded his email by stating, "I asked [Mr. Bradshaw]

to contact me after his meeting with the attorney so that I can know what direction to take on his

application."  Id.; Trial Tr. at 557:23-25 (Campbell).

   84. Later that day, Mr. Jurey received a call from Mr. Bradshaw, J. Ex. 25 at

B000421, who requested information from his file about a balloon payment caused by a disaster

set-aside in 1998 and an incident in 2000 when Mr. Bradshaw believed he was denied mediation

rights, D. Ex. 88.  Mr. Jurey responded in two letters that same day attaching the requested

information.  D. Exs. 298-99; see also D. Ex. 1 at 4.  On April 30, 2003, Mr. Bradshaw also

called Mr. Stiebe about the Farm Assessment sent to him by Mr. Jurey.  See D. Exs. 88, 89.

   85. On the afternoon of April 30, 2003, Mr. Jurey sent another email to

Mr. Stiebe and Mr. Campbell regarding the requests Mr. Bradshaw had made in telephone calls

on April 25 and April 30, 2003.  Mr. Jurey explained that an attorney was telling Mr. Bradshaw

what to request.  Mr. Jurey also explained that Mr. Bradshaw stated that he had received the

Farm Assessment and that he inquired about the regulations requiring it to be completed.  D.

Ex. 88.

   86. On May 9, 2003, Mr. Bradshaw called Mr. Jurey to ask who directs the FSA

employees in Kansas to implement administrative offsets.  J. Ex. 25 at B000420.  Mr. Jurey

checked with Mr. Stiebe and then called Mr. Bradshaw back to inform him that the relevant

individual was Carolyn Cooksie, Deputy Administrator of Farm Loan Programs.  Id.  Mr.

Bradshaw said that his attorney, James Myart, might call Mr. Jurey with some questions.  Id.;

Trial Tr. at 715:18-20 (Jurey).

87.     On May 14, 2003, Mr. Bradshaw called Mr. Jurey and asked how soon he needed to sign and return the Farm and Home Plan and Farm Assessment that Mr. Jurey had mailed to him.  J. Ex. 25 at B000420; Trial Tr. at 715:4-5 (Jurey).  Mr. Jurey told him that it would be best if he returned the forms before the balance sheet was 90 days old because an approval cannot be based on a balance sheet older than that.  J. Ex. 25 at B000420; Trial Tr. at 715:6-8 (Jurey).  Mr. Bradshaw said that his attorney was in Washington, D.C. meeting with FSA national office personnel.  J. Ex. 25 at B000420; Trial Tr. at 715:12-13 (Jurey).  He said that he did not want to sign the Farm and Home Plan and the Farm Assessment without advice from his attorney.  J. Ex. 25 at B000420; Trial Tr. at 715:13-15 (Jurey).  He also said that when he recently met with his attorney they did not get around to discussing those forms.  J. Ex. 25 at B000420; Trial Tr. at 715:15-17 (Jurey).

88.     Also on May 14, 2003, Mr. Bradshaw's right to seek reconsideration, mediation, or appeal of the April 10, 2003 denial letter lapsed.  Mr. Bradshaw did not exercise any of these rights as set forth in the April 10 letter.  J. Exs. 13, 22; Trial Tr. at 139:15-140:4 (Bradshaw).  Mr. Bradshaw testified that he did not take advantage of the right because Mr. Jurey "had said he was continuing to work on [the 2002 application], so [Mr. Bradshaw] was giving him the benefit of the doubt."  Trial Tr. at 140:2-4 (Bradshaw).

89.     On May 15, 2003, Mr. Jurey sent an email to Mr. Stiebe and Mr. Campbell regarding his conversation with Mr. Bradshaw on May 14, 2003.  J. Ex. 22.  Mr. Jurey explained that in the May 14 call, Mr. Bradshaw asked how soon he needed to sign the Farm and Home Plan and that Mr. Bradshaw stated he would not sign it without authorization from his attorney.  J. Ex. 22; Trial Tr. at 711:15-712:10 (Jurey).  Mr. Jurey stated that he was unsure what Mr. Bradshaw and his attorney were working on, but that their priority appeared to be something

other than the proposed FSA loans and loan servicing.  J. Ex. 22; Trial Tr. at 712:11-15 (Jurey).

He also explained that Mr. Bradshaw had not yet signed the Farm and Home Plan.  J. Ex. 22;

Trial Tr. at 712:3-4.

90.   On May 20, 2003, Mr. Bradshaw called Mr. Jurey to inquire about why the

balance sheet showed a delinquent amount for John Deere Credit, a matter which had been

brought to his attention by Fidelity State Bank.  J. Ex. 25 at B000420.  The same day, Mr. Jurey

mailed a letter to Mr. Bradshaw and attached documentation received from John Deere Credit

showing a delinquent balance on two loans.  D. Ex. 90.

91.   On May 22, 2003, Mr. Bradshaw called Mr. Jurey again about the delinquent

amount at John Deere Credit. Mr. Bradshaw said that he called John Deere Credit and that

someone at John Deere had told him that the loans were not delinquent.  Mr. Jurey responded

that FSA had merely used the information John Deere Credit had provided to FSA.  Mr.

Bradshaw said that this was an issue his attorney would look at because FSA gave out

information that he believed was incorrect.  J. Ex. 25 at B000419.

#### 4.  Mr. Myart's Involvement

92.   On May 30, 2003, Mr. Bradshaw's attorney, James Myart, sent a letter to

certain FSA national office officials, including Ms. Cooksie and Ms. Cramer.  The letter

demanded that a $9,000 program payment be released to Mr. Bradshaw rather than being subject

to administrative offset. D. Ex. 13.

93.   That same day, Ms. Cramer faxed a copy of Mr. Myart's letter to Mr. Jurey.

D. Ex. 13; J. Ex. 24.  She also sent a memorandum to her supervisor, District Director Mark

Hendrickson, notifying him that Mr. Bradshaw was requesting that certain program payments be

issued.  P. Ex. 6.

94.   Mr. Bradshaw called Mr. Jurey the morning of May 30, 2003 to inform him about Mr. Myart's letter, explaining that his attorney did not send Mr. Jurey a copy because Mr. Jurey was not the one who issues program payments.  J. Ex. 24.  Mr. Jurey then faxed copies of Mr. Myart's letter and Ms. Cramer's memorandum to Mr. Stiebe and Mr. Campbell along with a cover memorandum.  J. Ex. 24.

95.   On the afternoon of May 30, 2003, Trish Halstead, the Kansas FSA Civil Rights Coordinator, forwarded an email to Mr. Jurey and Mr. Stiebe and forwarded a second email to Ms. Cramer, Mr. Hendrickson, Mr. Jurey, Mr. Stiebe, and three other members of the state office.  The emails concerned the FSA national office's advice on responding to Mr. Myart's letter.  D. Ex. 92.  The national office staff had advised the state office staff that Mr. Bradshaw was not entitled to a refund of administrative offsets.  It further advised that foreclosure is the only "adverse action" prohibited during the pendency of a civil rights complaint.  Id. at B001629.

96.   Also on the afternoon of May 30, 2003, Mr. Myart and Mr. Bradshaw called the state office regarding the administrative offset issue.  They spoke with Jack Salava, the Kansas State Executive Director's executive assistant, who recorded the substance of the conversation in a memorandum.  See Trial Tr. at 483:10-485:4 (Stiebe).  Mr. Myart told Mr. Salava that he expected the State Executive Director's response to the May 30 letter, as well as all other communications, to be sent to Mr. Myart because he was Mr. Bradshaw's representative.  D. Ex. 94 at B006640.

97.   By letter dated May 30, 2003, Bill Fuller, Kansas State Executive Director, responded to Mr. Myart's letter and explained that administrative offsets of federal payments are

legally authorized without regard to a pending civil rights complaint.  J. Ex. 23.  He therefore denied the request for release of the $9,000 program payment.

### 5.  Subsequent Developments Affecting the 2002 Application

98.  On June 3, 2003, the balance sheet relating to Mr. Bradshaw expired because it had been created 90 days earlier, on March 5, 2003.  If Mr. Bradshaw had returned the signed documents after that point, Mr. Jurey would have had to update the balance sheet by re-contacting each creditor and confirming any other developments with Mr. Bradshaw. J. Ex. 25 at B000420 (explaining that balance sheet needed to be less than 90 days old); id. at B000438 (noting that balance sheet was updated March 5, 2003).

99.  On July 1, 2003, Mr. Hendrickson emailed Lee Hartford, a Kansas State Office employee, regarding the May 30, 2003 letter sent by Mr. Myart.  Mr. Hendrickson wrote: "Seems like this one just never goes away, I expect you have a couple of others like it but for me this would be nice to resolve as far as the complaints are concerned."  P. Ex. 13.  Mr. Hendrickson testified that this statement referred to his desire that Mr. Bradshaw's administrative complaint against Mr. Hendrickson's office be resolved by the USDA Office of Civil Rights.  Trial Tr. at 623:22-624:5 (Hendrickson).

100.  On August 11, 2003, Mr. Bradshaw called Mr. Jurey regarding an appraisal bill he had received from Farm Credit of Ness City.  Mr. Bradshaw said that if FSA did not agree to pay for it, he would file a civil rights complaint or add it to another complaint his lawyer was preparing.  J. Ex. 25 at B000418-19.  After reviewing the file, Mr. Jurey sent Mr. Bradshaw a response the same day explaining why FSA was not required to pay for the appraisal.  D. Ex. 97.

101.  On August 14, 2003, Mr. Bradshaw called Mr. Jurey and asked whether FSA was going to take certain program payments by administrative offset.  Mr. Jurey explained

that FSA was required to do so.  Mr. Bradshaw asked for a letter confirming this fact.  In this call, Mr. Bradshaw expressed frustration with a variety of issues including (1) the slow response to his civil rights complaints, (2) the administrative offset, and (3) having his Pigford Track A claim denied.  Mr. Bradshaw spoke of his intent to release information to The Washington Post and to sue FSA and its employees, including Mr. Jurey.  J. Ex. 25 at B000418.

102.  On August 15, 2003, Mr. Jurey sent a letter to Mr. Bradshaw providing written confirmation of the administrative offset, which Mr. Bradshaw had requested on August 14, 2003.  D. Ex. 14.

103.  On September 16, 2003, Mr. Bradshaw called Mr. Jurey and requested his FSA loan balances and payment status.  Mr. Jurey provided him an estimate over the phone. That same day, Mr. Jurey sent a letter to Mr. Bradshaw providing the requested information.  At that point, Mr. Bradshaw's loans were $45,621.58 past due.  J. Ex. 25 at B000418; D. Ex. 15; see Stip. No. 51.

104.  On October 9, 2003, Mr. Bradshaw called Mr. Jurey after certain program payments were taken by administrative offset.  Mr. Bradshaw stated that FSA had excess security and asked Mr. Jurey to send a letter stating whether FSA would release some security. Mr. Bradshaw stated that the letter would be faxed to his attorney and would be used in a lawsuit against FSA and Mr. Jurey.  D. Ex. 98.

105.  On October 9, 2003, Mr. Jurey sent a letter to Mr. Bradshaw responding to his request.  Mr. Jurey explained FSA's regulations regarding the circumstances under which FSA would release collateral.  He stated that if Mr. Bradshaw wished to apply for release of security, his request would be considered in light of the listed requirements and any other

relevant regulations.  Mr. Jurey sent a copy of the letter and a memorandum explaining the phone

call to Mr. Stiebe and Mr. Campbell.  D. Exs. 16, 98; J. Ex. 25 at B000418.

106.   None of the many letters Mr. Jurey received from Mr. Bradshaw or his

attorney – and none of the conversations Mr. Jurey had with Mr. Bradshaw between the end of

May 2003 and early October 2003 – related to Mr. Bradshaw's 2002 application or to

information required to complete the application.  Trial Tr. at 721:24-722:10 (Jurey).

107.   Mr. Jurey testified that Mr. Bradshaw never told him that he had signed the

Farm and Home Plan or that he had mailed the Farm and Loan Plan, the 2002 tax return, or the

Farm Assessment.  He also testified that these documents were never received in his office.  Trial

Tr. at 722:11-723:13 (Jurey).

108.   On October 11, 2003, one of Mr. Bradshaw's FSA loans became fully due,

meaning that more than $88,000 would be required to address the past-due status of this loan

instead of the approximately $39,000 amount Mr. Jurey had accounted for in developing the

feasible plan in April 2003.  See J. Ex. 15 at B001671 (explaining that the loan would mature on

October 11, 2003); D. Ex. 15 (showing the payment status and total amount due on the loan).

Mr. Jurey had warned Mr. Bradshaw about the large payment that would be due on

October 11, 2003.  See, e.g., D. Ex. 5 at B001697; J. Ex. 15 at B001671.

109.   After October 11, 2003, Mr. Jurey concluded that his April 2003 proposal

would need to be significantly reworked and might no longer be viable.  Trial Tr.

at 704:19-707:10 (Jurey).  Accordingly, on October 16, 2003, Mr. Jurey placed post-it notes on

the file copies of the Farm and Home Plan and Farm Assessment that he had sent for signature,

stating that Mr. Bradshaw had not returned the signed Farm and Home Plan or the Farm

Assessment:  "Suspense. To date Rod has not signed & returned. 10/16/03."  J. Ex. 21 at

32

B001401; D. Ex. 10 at B001395.  Mr. Jurey testified that this was intended to remind himself in the future that signed copies did not appear elsewhere in the file.  Trial Tr. at 704:11-14 (Jurey).

110.  On October 17, 2003, Mr. Jurey sent an email to Mr. Hartford in the Kansas state office noting that agency guidance provided that cases should not be prepared for acceleration if a civil rights complaint remains pending and asking whether there was anything Mr. Jurey should be doing on Mr. Bradshaw's file "[o]ther than answering his phone calls & collecting Admin Offset."  P. Ex. 17.

111.  On November 13, 2003, Mr. Bradshaw called Mr. Jurey to express concern about FSA's collection by administrative offset of more than the $45,621.58 that Mr. Jurey had listed as past due in the September 16, 2003 letter.  Mr. Bradshaw asked Mr. Jurey to send a letter to Mr. Myart explaining FSA's actions.  That same day, Mr. Jurey sent a letter to Mr. Myart explaining that the past due balance had increased substantially in October 2003 and that the fact that this would occur had been noted in Mr. Jurey's September 16, 2003 letter to Mr. Bradshaw.  See D. Ex. 99.

112.  On November 14, 2003, Mr. Jurey sent a letter to Mr. Bradshaw providing the updated loan balances and payment status he had requested.  D. Ex. 100; J. Ex. 25 at B000418.

### 6.  Mr. Bradshaw's Interactions with Mr. Jurey After 2003

113.  After November 2003, Mr. Jurey did not hear anything from Mr. Bradshaw for nine months.  Then, on August 13, 2004, Mr. Bradshaw called Mr. Jurey to request additional information regarding past administrative offsets.  Mr. Bradshaw called again regarding the same matter on August 16, 2004.  Mr. Jurey provided some of the requested information and stated that more time was required to research other information.  D. Ex. 1 at 6; D. Ex. 26 at B000417.

114.  This lawsuit was filed on August 23, 2004.  On August 30, 2004, Mr. Bradshaw called Mr. Jurey to inquire about the release of collateral.  D. Ex. 1 at 6; D. Ex. 26 at B000416.

115.  On September 1, 2004, Mr. Jurey sent a letter to Mr. Bradshaw providing a detailed summary of all payments taken by administrative offset from 1999 through 2004, as requested on August 13 and 16, 2004.  D. Ex. 1 at 6; D. Ex. 111.

116.  On September 2, 2004, Mr. Jurey sent a letter to Mr. Bradshaw providing the current loan balances and payment statuses for outstanding FSA loans and answering Mr. Bradshaw's questions about subordination applications and release of collateral.  D. Ex 17 at B000305-06.  Mr. Jurey also explained that he had been "unable to continue processing the proposed subordination and debt restructure [in 2003] because you did not sign the Farm & Home Plan and provide copies of your 2002 tax return or income & expenses summary."  D. Ex. 1 at 6; D. Ex. 17 at B000305.  Mr. Bradshaw never responded to this letter.  Trial Tr. at 728:20-24 (Jurey).

117.  On four occasions – September 7, 2004; November 27, 2004; January 26, 2005; and March 7, 2005 – Mr. Jurey sent Mr. Bradshaw copies of a subordination application after Mr. Bradshaw called and inquired about such applications or about release of collateral.  D. Exs. 1 at 6-7, 112, 116, 120, 124; Trial Tr. at 730:2-731:3 (Jurey).

118.  On March 1, 2005, Mr. Bradshaw called Mr. Jurey and said that he would submit a subordination application in order to see how long it would take to process; he said he would contact a congressional committee if it took longer than fifteen days.  Mr. Jurey responded that he thought that fifteen days was likely the average nationwide processing time after an

application was completed, but that FSA regulations give the agency up to sixty days to process

an application.  He also said that all applicants are treated equally.  D. Ex. 18 at B000265.

119.  On March 1, 2005, Mr. Jurey forwarded a summary of his March 1, 2005

telephone conversation with Mr. Bradshaw by email to Mr. Stiebe and Mr. Campbell.  He stated:

"If Rodney's financial situation is the same as it was last time I processed a request, it would be

very difficult to approve a complete application within 15 days . . . because reaching a positive

cash flow would require negotiating with other lenders to make major changes."  He noted that

"[t]o complete processing within a reasonable time, we may need to deny the application.  We

could then negotiate with other lenders in mediation and hopefully come to a positive result."  D.

Ex. 18 at B000265; D. Ex. 26 at B000411.

120.  On March 2, 2005, Mr. Campbell responded to Mr. Jurey's March 1 email.

He explained that FSA would not typically reject applications under similar circumstances and

that FSA "will give everyone equal treatment."  He also stated:  "If we get a complete

application by deadlines provided in the regulations, we'll work to meet or beat the Kansas

average time frame of 18 days.  If negotiations with lenders are required to move toward

approval of a subordination, then this may delay our processing, though I can't see rejecting the

application on this basis alone."  D. Ex. 18 at B000264-65.

121.  Mr. Jurey responded on March 2, 2005.  He expressed concern that "[t]his

year, it may be even more difficult to come up with a feasible plan because there is more

delinquent FSA debt to deal with."  D. Ex. 18 at B000264.

122.  Mr. Stiebe responded on March 31, 2005.  Based on a conversation with the

head of the FSA loan making division at the national office, Mr. Stiebe recommended that Mr.

Jurey "get a complete application and just work up the cashflow based on face value of what the

lenders report" and then "[a]pprove or reject it based on the info available."  D. Ex. 304 at B007950.  He recommended against the alternative approach of repeating Mr. Jurey's prior effort to get concessions from all of Mr. Bradshaw's lenders, which would take a huge amount of time and which Mr. Bradshaw might not accept.  Id.  He made this suggestion in light of the "long history" between FSA and Mr. Bradshaw.  Id.

123.    On March 10, 2005, Mr. Jurey received a real estate subordination application from Mr. Bradshaw.  This was the first application Mr. Bradshaw had submitted since submitting his 2002 application.  D. Ex. 1 at 7; D. Ex. 125; D. Ex. 2.  In April 2005, Mr. Bradshaw's loans were paid current by administrative offset.  P. Ex. 7 (notifying Ms. Cramer that administrative offset could be terminated because prior offsets had paid the loans current).  This addressed Mr. Bradshaw's delinquency and allayed Mr. Jurey's concerns about the difficulty of dealing with more delinquent FSA debt.

124.    On April 12, 2005, Mr. Jurey signed as complete the loan servicing checklist that had been initiated in April 2002 when the primary loan servicing notice had been sent to Mr. Bradshaw.  In Part E, Mr. Jurey noted that the account was now paid current.  D. Ex. 19 at B001213.  In Part B, Mr. Jurey wrote:  "Late 2002 thru early 2003, FSA worked up proposal involving refinancing / restructure by several lenders, which would enable FSA to do combination of 1951-S + subordination.  See letter of 4/18/2003 outlining proposal.  Borrower did not respond."  D. Ex. 19 at B001211.

125.    Mr. Bradshaw's March 10, 2005 subordination application was reinstated on May 23, 2005 after being withdrawn for a period of time for failure to submit information necessary to complete the application.  D. Ex. 20; see D. Ex. 2, Row 2.

126.  On May 31, 2005, Mr. Jurey sent a letter to Mr. Bradshaw suggesting ways to achieve a positive cash flow.  He sent a copy of the letter to Mr. Stiebe and Mr. Campbell by email.  D. Exs. 20, 129.  Mr. Campbell responded to the email, stating:  "Great letter with many good options for the Bradshaw's to consider Dwight.  Great job."  Mr. Stiebe responded:  "I agree with what Mike said.  Great job Dwight.  Nobody can say you haven't given the application your full consideration and explored all options."  D. Ex. 20.

127.  Mr. Jurey was able to develop a feasible plan and positive cash flow.  On June 14, 2005, Mr. Jurey sent a letter to Mr. Bradshaw attaching the positive cash flow, balance sheets, Farm Assessment, and direct operating loan request for Mr. Bradshaw's signature.  He told Mr. Bradshaw that he was ready to approve the subordination applications as soon as Mr. Bradshaw signed and returned the documents.  D. Ex. 2, Row 2; D. Ex. 26 at B000385; D. Ex. 144.

128.  On June 23, 2005, Mr. Jurey received the signed documents from Mr. Bradshaw.  D. Ex. 2, Row 2.  Mr. Jurey sent an email to Mr. Stiebe, Mr. Campbell, and Dean Altenhofen, a Kansas State Office employee, explaining that Mr. Bradshaw had signed the documents and that Mr. Jurey had approved the subordination. D. Ex. 144; Stip. No. 46.

129.  FSA issued the subordination on June 24, 2005, and Farm Credit of Ness City issued a loan on the basis of that collateral.  D. Ex. 2, Row 2; Stip. Nos. 45, 47, 48.

130.  From 2005 to 2008, Mr. Bradshaw applied for a total of eight additional loans and two disaster set-asides.  Three loans and one disaster set-aside were approved or recommended for approval by Mr. Jurey and closed.  Three loans were approved or recommended for approval by Mr. Jurey but withdrawn for various reasons.  Two loans and one

disaster set-aside were withdrawn as incomplete or denied.  D. Ex. 2.  The loans for which he applied were as follows:

        a.  In June 2005, Mr. Bradshaw submitted an application for a direct operating loan of $30,000 to purchase cattle, which Mr. Jurey approved in July 2005, and which closed in October 2005.  D. Ex. 2, Row 3; D. Ex. 23 at B002889.

        b.  In the fall of 2005, Mr. Bradshaw applied for a $38,000 operating loan and a $135,500 operating loan.  His application for a $38,000 operating loan was withdrawn as incomplete, while a $135,500 operating loan was approved by Mr. Jurey but withdrawn after Mr. Bradshaw failed to return a signed approval form.  D. Ex. 2, Rows 4, 5; D. Ex. 23 at B002889.

        c.  In March 2006, Mr. Bradshaw applied for a $73,000 operating loan; that application was likewise withdrawn as incomplete.  D. Ex. 2, Row 6.; D. Ex. 23 at B002889.

        d.  In November 2006, an application for two loans totaling $162,540 was recommended for approval by Mr. Jurey and approved by the state office.  Although Mr. Bradshaw signed the acceptance form, the loan never closed because Mr. Bradshaw changed his mind about loan amounts and purposes.  D. Ex. 2, Row 7; D. Ex. 23 at B002889-90.

        e.  In January and February 2007, Mr. Jurey approved a disaster set-aside and recommended approval of two operating loans that totaled $163,570.  The state office approved the operating loans, and the disaster set-aside and loans closed on March 14, 2007.  D. Ex. 2, Rows 8, 9.

        f.  In 2008, Mr. Bradshaw requested another disaster set-aside, but Mr. Jurey denied the request after Mr. Bradshaw failed to submit the required documents by the deadline.  D. Ex. 2, Row 10.

131.   On July 27, 2006, Mr. Jurey sent a letter to Mr. Bradshaw responding to his request for specific information about his applications and copies of all letters that FSA had sent to Mr. Bradshaw since November 2002.  D. Ex. 21 at B002612.  In this letter, Mr. Jurey explained that with respect to the 2002 application, he had sent a letter to Mr. Bradshaw on April 18, 2003 proposing "a financing package that would result in a positive cash flow.  You did not express any interest in pursuing this proposal."  Id. at B002613.

132.   On April 28, 2008, Mr. Jurey met with Mr. Bradshaw at the USDA Service Center in Jetmore, Kansas.  See D. Ex. 22 at B005357-58.  Mr. Bradshaw sought reconsideration of a notice of intent to accelerate that FSA had issued because Mr. Bradshaw did not apply for primary loan servicing.  Id. at B005358.  At the meeting, Mr. Jurey told Mr. Bradshaw that he would evaluate Mr. Bradshaw's request thoroughly and fairly, that he would spend extra time reviewing the FSA handbooks to make sure he did not overlook any recent changes to the handbooks, and that he would consult personnel higher up in FSA as necessary.  Mr. Bradshaw responded that he knew Mr. Jurey would be fair based on his experience with Mr. Jurey, and that other people with whom he consults regarding FSA loan issues wish all FSA staff were as fair as Mr. Jurey.  Id.; Trial Tr. at 746:21-750:6 (Jurey).

133.   On September 12, 2008, Mr. Jurey sent a letter to Mr. Bradshaw responding to his requests for information concerning loan applications.  Mr. Jurey provided a written summary of all of Mr. Bradshaw's loan applications from 1996 to 2008 along with copies of each application form and attachments.  D. Ex. 23 at B002887.  For the 2002 application, Mr. Jurey's summary noted that he had "sent a letter to Bradshaw's on 4/18/2003 proposing a financing package that would result in a positive cash flow.  They did not express any interest in pursuing this proposal."  D. Ex. 23 at B002889.

134.  On May 10, 2013, Mr. Jurey sent a letter to Mr. Bradshaw responding to his request for information and documents.  Mr. Jurey again explained the circumstances after the April 10, 2003 denial letter, stating:  "My subsequent letter of April 18, 2003 outlined a proposal that would have resulted in a feasible financing package and approval of your application.  You did not accept that proposal."  D. Ex. 24 at B003412.  Mr. Bradshaw never responded to this letter.  Trial Tr. at 728:20-24 (Jurey).

135.  Despite the fact that over the years Mr. Bradshaw usually called Mr. Jurey when he thought something was incorrect in a letter or other communication, Mr. Jurey testified that Mr. Bradshaw never called Mr. Jurey regarding the statements Mr. Jurey made in July 2006, September 2008 and May 2013 concerning Mr. Bradshaw's failure to pursue the 2002 application.  Trial Tr. at 728:20-24 (Jurey).  He testified that Mr. Bradshaw had "never disputed with [him his] characterization of the conclusion of [the 2002] loan application."  Id. at 729:4-7 (Jurey).

### 7.  Mark Hendrickson

136.  Mark Hendrickson worked for FSA or its predecessor, FmHA, in Montgomery County from 1984 until 1994.  During that time, he was an Assistant Farm Loan Manager and later a Farm Loan Manager.  Stip. No. 10; Trial Tr. at 608:1-9 (Hendrickson).  Mr. Hendrickson testified that he met Mr. Bradshaw in the mid-to-late 1990s.  Trial Tr. at 612:11-13 (Hendrickson); see also Trial Tr. at 47:16-17 (Bradshaw).

137.  From 1996 to 2015, Mark Hendrickson was a District Director with FSA.  Stip. No. 11; Trial Tr. at 590:6-19; 608:20-22 (Hendrickson); Trial Tr. at 47:5-7 (Bradshaw).  He retired in 2015 or 2016.  Trial Tr. at 589:5-6 (Hendrickson).  In his capacity as District Director,

Mr. Hendrickson supervised numerous farm program offices, including the one in Jetmore, Kansas.  Stip. No. 12; J. Ex. 3.

138.  Mr. Hendrickson also lived in Jetmore from 1996 to 2015.  Trial Tr. at 599:17-20; 612:14-613:3 (Hendrickson).

139.  While under Mr. Hendrickson's supervision, and before his loan file was transferred to a different office, Mr. Bradshaw received two loans in 1995 and three loans in 1996.  See D. Ex. 87 at B001648; D. Ex. 23 at B002888 (explaining the 1996 loans in detail).

140.  As the Farm Loan Chief for the State of Kansas, Mr. Stiebe worked with Mr. Hendrickson for many years.  They interacted on an individual basis ten to twelve times a year while Mr. Hendrickson was a District Director.  Trial Tr. at 590:20-591:10 (Hendrickson).

141.  Mr. Hendrickson, along with other District Directors, would travel to the state office for management team conferences four to six times per year.  Trial Tr. at 511:18-23 (Stiebe).  During those management team conferences, Mr. Stiebe would meet with each District Director one-on-one to discuss specific cases and go over issues and concerns.  Trial Tr. at 513:8-22 (Stiebe); id. at 614:9-15 (Hendrickson).  Mr. Hendrickson sometimes discussed Mr. Bradshaw's case "in general terms" with Mr. Stiebe during these one-on-ones.  Id. at 621:5-14 (Hendrickson).

142.  Mr. Bradshaw's grandmother, Sallie Gullick, farmed cotton in Montgomery County, Kansas.  Trial Tr. at 120:9-12 (Bradshaw).  Mr. Hendrickson handled the loan file of Sallie Gullick's son, Leo Gullick.  Id. at 604:8-9 (Hendrickson).  Mr. Hendrickson knew Leo Gullick was the son of Sallie Gullick, and he knew that Sallie Gullick was Mr. Bradshaw's grandmother.  Id. at 604:4-7; 610:7-8 (Hendrickson).  Mr. Hendrickson testified that he did not know Sallie Gullick personally and was not her loan officer.  Id. at 604:10-19 (Hendrickson).

143.   In 1998, Mr. Bradshaw was at the Dodge City office to meet with Ms.
Melody Julian, his Farm Loan Manager at the time, when Mr. Bradshaw ran into Mr.
Hendrickson.  Trial Tr. at 120:15-121:5 (Bradshaw).  Mr. Bradshaw testified that Mr.
Hendrickson told Mr. Bradshaw that he had dealt with Mr. Bradshaw's grandmother, Sallie
Gullick, when Mr. Hendrickson worked in Montgomery County, Kansas.  He testified that Mr.
Hendrickson said he had played a role in getting Ms. Gullick out of the farming business with
FSA.  Id. at 120:4-8; 121:7-11, 20-22 (Bradshaw).  Mr. Bradshaw testified that he felt humiliated
and devastated when Mr. Hendrickson made that comment.  Id. at 121:18-19 (Bradshaw).

144.   Mr. Hendrickson denied this claim.  He explained that he did not start work
in Montgomery County until 1986, that he never met Sallie Gullick, that he never handled an
application for Ms. Gullick, and that he is not aware of any file that Ms. Gullick had with FSA
during the years he worked in Montgomery County.  See Trial Tr. at 603:11-604:25
(Hendrickson).  Mr. Bradshaw acknowledged that records show Ms. Gullick died in 1983, which
was before Mr. Hendrickson began working in Montgomery County.  See id. at 133:7-134:9
(Bradshaw).

145.   Around May 2002, Mr. Bradshaw requested that his farm loan case file be
transferred away from the office overseen by Mr. Hendrickson.  FSA granted Mr. Bradshaw's
request to be transferred out of Mr. Hendrickson's district.  Trial Tr. at 49:4-12 (Bradshaw); id.
at 514:4-21 (Stiebe); Stip. No. 53.

146.   Mr. Stiebe knew that there was antipathy between Mr. Hendrickson and Mr.
Bradshaw.  Specifically, he testified that Mr. Bradshaw had antipathy for Mr. Hendrickson.
Trial Tr. at 537:1-5 (Stiebe).  Mr. Stiebe testified that this antipathy was the reason that FSA

transferred Mr. Bradshaw's loans away from Mr. Hendrickson's district.  Id. at 514:17-21 (Stiebe).

147.  After May 2002, Mr. Hendrickson had no responsibility for Mr. Bradshaw's FSA loans, loan applications, or loan servicing.  See Trial Tr. at 593:17-20 (Hendrickson).  But Mr. Bradshaw's program payments file remained with Mr. Hendrickson's office, under Mr. Hendrickson's supervision.  Id. at 514:22-515:3 (Stiebe); id. at 593:21-24 (Hendrickson); see P. Ex 13 at B009307.

148.  Mr. Hendrickson testified that he did not seek to influence decisions regarding Mr. Bradshaw's FSA loans after May 2002.  Trial Tr. at 591:25-592:7, 594:15-17 (Hendrickson); see also id. at 486:13-487:11 (Stiebe); id. at 562:20-563:7 (Campbell); id. at 755:1-16 (Jurey).

149.  Mr. Jurey testified that he never talked with Mr. Hendrickson about any of Mr. Bradshaw's loan applications and that neither Mr. Hendrickson nor any other FSA employee ever asked Mr. Jurey not to approve or finalize a loan.  Trial Tr. at 755:1-16 (Jurey).

150.  In May 2003 – after Mr. Bradshaw's loan file had been transferred away from Mr. Hendrickson's district – Mr. Hendrickson sometimes was included on communications regarding Mr. Bradshaw's administrative offsets because he supervised Ms. Cramer, who was responsible for making those payments.  See, e.g., J. Ex. 23; P. Ex. 13; see also Trial Tr. at 116:2-117:8 (Bradshaw); id. at 618:12-16 (Hendrickson).  Mr. Jurey also continued to update Mr. Hendrickson on Mr. Bradshaw's loans.  Trial Tr. at 618:4-23 (Hendrickson); P. Ex. 7.

151.  Mr. Bradshaw testified that he had an interaction with Mr. Hendrickson in October or November 2008.  Trial Tr. at 125:9-14 (Bradshaw).  On that day, Mr. Bradshaw drove into Jetmore to run an errand.  Id. at 125:22-24 (Bradshaw).  He pulled up in front of the

Jetmore lumber yard in his vehicle, and Mr. Hendrickson was there.  <u>Id</u>. at 125:25, 126:1

(Bradshaw); J. Ex. 43 at 378:17-20.

   152.   Mr. Bradshaw testified that Mr. Hendrickson got out of his vehicle, walked

over to Mr. Bradshaw, and said, "It's niggers like you that cause the government to lose money."

Trial Tr. at 126:1-5 (Bradshaw).  According to Mr. Bradshaw, Mr. Hendrickson told him people

like him did not deserve FSA assistance.  J. Ex. 43 at 381:13-20; J. Ex. 42 at 40:17-20.  Mr.

Bradshaw testified that he was "blown away," so he just walked across the street and went to pay

his newspaper bill.  Trial Tr. at 126:6-8 (Bradshaw).  He said he felt humiliated and degraded.

<u>Id</u>. at 126:9-10 (Bradshaw).  Mr. Bradshaw told his wife about the incident around the time that

it happened.  J. Ex. 42 at 39:9-40:9.

   153.   Mr. Hendrickson recalls seeing Mr. Bradshaw outside of the lumber yard on

Main Street in Jetmore, Kansas in October 2008.  Trial Tr. at 599:16-20 (Hendrickson).  He

testified that he did not talk to Mr. Bradshaw on that day and "did not call him the N word."  <u>Id</u>.

at 599:21-22, 600:5-13 (Hendrickson)

   154.   A few days later, Mr. Bradshaw and Mr. Hendrickson saw each another

again.  Trial Tr. at 126:13-14 (Bradshaw).  Mr. Bradshaw was driving north out of Jetmore

towards his farm, and Mr. Hendrickson was coming down Highway 156 from the west.  <u>Id</u>.

at 126:14-17 (Bradshaw).  Mr. Bradshaw testified that at the intersection of Highways 156

and 283 on the north end of Jetmore, Mr. Hendrickson gave Mr. Bradshaw the middle finger.  <u>Id</u>.

at 126:14-19 (Bradshaw); J. Ex. 43 at 385:18-386:3:5-8.  Mr. Bradshaw testified that he did not

understand why Mr. Hendrickson would have just done that.  Trial Tr. at 126:25-127:1

(Bradshaw).

155.  Mr. Hendrickson denied that he "flipped [Mr. Bradshaw] off" that day and stated that he has never given Mr. Bradshaw the middle finger.  He testified that he commonly gives a wave of the hand or "put[s] up a finger or two" to people while he is driving.  Trial Tr. at 600:19-601:6 (Hendrickson).

156.  On November 10, 2008, after these two incidents, Mr. Bradshaw wrote a letter to the Assistant Secretary of Agriculture for Civil Rights about the recent incidents with Mr. Hendrickson.  J. Ex. 26; Trial Tr. at 127:6-128:5 (Bradshaw).

157.  Mr. Hendrickson testified that he knows several members of Mr. Bradshaw's family very well, including Mr. Bradshaw's uncle, Wilburn Bradshaw, and Mr. Bradshaw's cousin, Marc Bradshaw.  Trial Tr. at 624:6-12 (Hendrickson); id. at 134:14-22 (Bradshaw).  Mr. Hendrickson started a church with Mr. Bradshaw's cousin, Marc Bradshaw, who served as his pastor and remains a good friend.  Id. at 624:13-18 (Hendrickson).

158.  Mr. Hendrickson testified that he did not tolerate racial, sexual, or crude language in the workplace.  Trial Tr. at 601:17-602:16 (Hendrickson); see also id. at 563:12-564:5 (Campbell) ("Mark Hendrickson is a religious individual with zero tolerance for bad language and characters that do not -- characteristics, personal character that does not measure up to his standards, in my opinion.").

159.  Mr. Hendrickson also testified that he does not harbor racial prejudice and that there would be no circumstances under which it would be appropriate for FSA to decline to offer a loan to an applicant because of that applicant's race.  Trial Tr. at 601:10-16 (Hendrickson).

160.  Other FSA witnesses testified that they had no reason to believe Mr. Hendrickson harbors any racial prejudice.  See Trial Tr. at 487:9-11 (Stiebe); id. at 563:5-10, 573:5-7 (Campbell).

## C.  Proposed Comparators

161.  Alicia Balthazar, a paralegal at Hogan Lovells, testified that she reviewed Mr. Bradshaw's loan files and the loan files of fifteen white farmers whose files were maintained by the FSA office in Oakley and prepared a summary chart.  Trial Tr. at 367:10-23 (Balthazar); see P. Ex. 1.  For these farmers, she reviewed files covering the years 2002 through 2005.  Trial Tr. at 395:17-19.  She testified that she did not select the farmers whose files she reviewed or the loans to be included on the chart; someone else at her law firm did.  Id. at 395:7-16; 396:6; 397:8-13 (Balthazar).  She acknowledged that some loans were excluded.  Id. at 395:14-16 (Balthazar).  The summary chart included only one of Mr. Bradshaw's loans during that time.  Id. at 392:25-393:2 (Balthazar).

162.  Mr. Bradshaw and Farmers A-O on the summary chart all submitted loan applications to FSA between October 25, 2002 and January 12, 2005.  P. Exs. 1, 16; see Stip. No. 30.

163.  At least one loan application for Farmers A, B, C, E, F, G, H, J, K, L, N, and O was for a direct operating loan.  Mr. Bradshaw also applied for a direct operating loan during this period.  P. Exs. 1, 16; D. Ex. 2.

164.  One application for Farmers D, E, F, G, I, L, and M involved either a guaranteed operating loan, guaranteed farm ownership loan, or guaranteed line of credit, none of which Mr. Bradshaw applied for in his 2002 application.  P. Exs. 1, 16.

165.  Mr. Bradshaw and Farmer K applied for Emergency Loans during this period.  P. Ex. 1 at 1, 3; P. Ex. 16 at 1-2; J. Ex. 13.

166.  For Mr. Bradshaw and Farmers A, D, E, F, G, H, J, K, M, and O, the applications were for loans that would either restructure or refinance debt.  P. Exs. 1, 16; J. Ex. 15.

167.  Mr. Bradshaw and all the white farmers on the summary chart were at least 30 days delinquent on another FSA loan at the time of their loan applications.  P. Ex. 15 at 2-3; P. Ex. 16.

168.  Mr. Jurey was involved in the applications of Mr. Bradshaw and all the white farmers on the summary chart, except for those of Farmers F and G.  Trial Tr. at 765:14-770:6 (Jurey).

169.  FSA found a positive cash flow for at least one loan application for each white farmer and for Mr. Bradshaw's 2002 application.  J. Ex. 15 at B001671 (Mr. Bradshaw's positive cash flow); P. Ex. 1 (showing that funds were obligated); P. Ex. 16; Trial Tr. at 459:6-17 (Stiebe) (testifying that a farmer must have a positive cash flow to receive a loan).

170.  All white farmers had at least one loan approved and closed during this time period.  P. Ex. 16.  Farmers C, J, and L also each had one loan withdrawn as incomplete.  Id. at 1-2.  Farmer I had one loan withdrawn for other reasons.  Id. at 1.

171.  Mr. Bradshaw and Farmers D, G, and L were each not approved for loans because of a failure to project positive cash flow.  P. Ex. 16 at 1.  Farmers H and K each had one loan denied for other reasons.  Id. at 1-2.

*D.  Credibility*

172.  On the key issue of whether Mr. Bradshaw mailed the Farm and Home Plan

and his 2002 tax return to Mr. Jurey in April 2003, Mr. Bradshaw's credibility is directly in

issue.  He testified that he mailed them, while Mr. Jurey testified that they were never received in

his office.  Mr. Jurey also testified that in the many telephone conversations with Mr. Bradshaw

after the supposed dates of mailing, Mr. Bradshaw never inquired about the status of the loan

applications or whether the paperwork was in order.

173.  Mr. Bradshaw testified that he mailed his 2002 tax return to Mr. Jurey

within about a week after he filed it, either between April 7 and April 14, 2003 or between

April 14 and April 20, 2003.  Trial Tr. at 90:15-17; 100:21-101:4 (Bradshaw).  He further

testified that he would have mailed the signed Farm and Home Plan not "too long" after he got it,

probably "within a day or so" after receiving the April 25, 2003 letter.  Id. at 98:11-15

(Bradshaw).  Mr. Jurey testified that he never received these documents.  Id. at 722:14-723:13

(Jurey).  Mr. Bradshaw conceded that he has no proof that he sent the documents or that

Mr. Jurey received them.  Id. at 161:19-162:5 (Bradshaw).  And both he and Mr. Jurey testified

that there was no discussion of Mr. Bradshaw's mailing or Mr. Jurey's receiving these

documents in any of their many subsequent phone calls.  Id. at 722:11-723:13 (Jurey); id.

at 162:3-5 (Bradshaw).

174.  At his January 23, 2014 deposition, Mr. Bradshaw did not recall the final

conclusion of his 2002 application.  He testified as follows:

> Q  Do you recall submitting an application that Dwight Jurey
> processed at some point soon after your files were transferred to his
> office, that is correct?
>
> A  I recall submitting an application.

Q  Do you recall the final conclusion of that application?

A  I am afraid I don't.

J. Ex. 43 at 186:11-20.

175.  By Mr. Bradshaw's own admission, he did not tell Mr. Jurey in any telephone call after April 25, 2003 that he had signed and mailed the Farm and Home Plan or his 2002 tax return or that he wanted to proceed with the loan package Mr. Jurey had proposed. Trial Tr. at 153:17-154:7 (Bradshaw); see also id. at 722:4-723:4 (Jurey).

176.  Mr. Bradshaw did not assert that he signed and provided these documents in his federal complaint filed in August 2004 or in the proposed amended complaint filed in June 2005.  See Compl. (making no claims regarding a loan application in 2002 or 2003); 2d Am. Compl. ¶ 21 (making allegations only about the April 10, 2003 denial letter).

177.  Mr. Bradshaw did not assert that he signed and provided these documents in any subsequent conversation with Mr. Jurey, even after Mr. Jurey explained the reason the loan application did not proceed further in at least four letters to Mr. Bradshaw.  See D. Exs. 17, 21, 23, 24.

178.  Furthermore, the evidence at trial showed that, on numerous occasions, Mr. Bradshaw called Mr. Jurey or other FSA personnel to discuss various transactions, including calls regarding the 2002 application.  See generally D. Ex. 1; J. Ex. 25 at B000418-21.  But in none of these conversations did Mr. Bradshaw say that he wished to pursue the application.  See Trial Tr. at 722:4-10 (Jurey).

179.  In a letter to Mr. Bradshaw in 2004, Mr. Jurey explained his reason for suspending the prior application:  "I was unable to continue processing the proposed subordination and debt restructure because you did not sign the Farm & Home Plan and provide

copies of your 2002 tax return." D. Ex. 17 at B000305.  Even after receiving that unambiguous letter, Mr. Bradshaw never discussed the issue with Mr. Jurey or expressed a different view about what had transpired or might have caused the application to stall.  Trial Tr. at 728:20-729:7 (Jurey).

180.  Mr. Bradshaw did not assert that he signed and provided these documents in any of his interrogatory responses or supplemental interrogatory responses in this litigation.  See, e.g., D. Exs. 37, 41.

181.  Mr. Bradshaw first stated that he had signed and returned the Farm and Home Plan when, at his deposition on January 23, 2014, he was presented with the version attached to the April 18, 2003 letter (not the amended version attached to the April 25, 2003 letter).  See J. Ex. 43 at 159:7-18, 165:8-11, 175:16-177:11, 210:18-211:2).  Mr. Bradshaw testified at his deposition as follows:

> Q  Do you recall what you did after receiving this letter indicating a positive cash flow?
>
> A  No, I do not.
>
> Q  Do you see back on the first page of the letter, the section says that both of you "should sign the original Farm and Home Plan where indicated and return it to this office."  Do you recall doing that?
>
> A  Yes, whatever his request was I did it.
>
> Q  You believe you signed it and returned it?
>
> A  Oh I did.
>
> Q  The second bullet section says, "Please provide a copy of your 2002 tax return and other incomes and expenses statement as soon as possible."  Did you do that?
>
> A  Yes, I did.

> Q . . .  What is it that makes you certain that you signed it and provided these documents?
>
> A   Tax returns are essential to do business with any financial institution.  I would provide tax returns to any financial institution I do business with or I do not do business with them.  It is as simple as that.
>
> Q  And as far as signing the Farm and Home Plan?
>
> A  They were signed because when I got a Farm and Home Plan completed they were all signed to my knowledge.

J. Ex. 43 at 175:16-177:11; see also id. at 179:11-15 (asserting, with regard to the Farm and Home Plan attached to the April 18, 2003 letter:  "If it was attached to the letter, I am sure I did [sign it].").  Mr. Bradshaw's representations were not based on specific memory, but instead on his general habits.

182.  Mr. Bradshaw was then presented with the April 23, 2003 letter, which addressed the mistake regarding non-farm assets that Mr. Bradshaw had pointed out.  J. Ex. 43 at 181:12-17.  Thereafter, the following exchange occurred between defense counsel and Mr. Bradshaw:

> Q  I understand.  The second paragraph says, "I am sorry that you had miscommunication about an appraisal, one of your rental houses was left off the balance sheet of the Farm and Home Plan sent to you on April 18, 2003.  Do you think that that is an inaccuracy that you brought to his attention?
>
> A  It could have been.
>
> . . .
>
> Q  "I wouldn't want you to sign a balance sheet you think is inaccurate."  Does this make you think that you did not in fact sign the April 18 version, but rather notified him of an error in it?
>
> A  I don't know what that means.

> Q  So it doesn't make you any less certain that you signed the April
> 18 Farm and Loan Plan? . . . Because a moment ago you were certain
> that you signed the April 18, so . . . I'm asking you now whether you
> are any less certain that you signed the April 18 version?
>
> A  I believe it was signed.

Id. at 183:10-185:3.

183.  Mr. Bradshaw was then presented with the April 25, 2003 letter to which a

revised Farm and Home Plan was attached.  J. Ex. 43 at 186:3-6.  Thereafter, the following

exchange occurred:

> Q  This letter also asks you and your wife to sign the revised Farm
> and Home Plan.  Do you believe that you signed this revised plan?
>
> A  One of them was signed because I know that.  I can tell you that.

Id. at 190:12-17.  Mr. Bradshaw finally testified that he was "sure" the April 25, 2003 Farm and

Home Plan was signed.  Id. at 210:18-211:2, 212:2-6.

## II.  CONCLUSIONS OF LAW

### A.  Legal Standards

The Equal Credit Opportunity Act ("ECOA") creates a private right of action

against a creditor who discriminates "against any applicant, with respect to any aspect of a credit

transaction . . . on the basis of race."  15 U.S.C. § 1691(a); see Garcia v. Johanns, 444

F.3d 625, 629 n.4 (D.C. Cir. 2006).  The statute defines the term "creditor" to include the United

States government, see 15 U.S.C. §§ 1691a(e), (f), and thereby waives the United States'

sovereign immunity for claims brought under the ECOA.  See Moore v. USDA, 55

F.3d 991, 994-95 (5th Cir. 1995); Williams v. Conner, 522 F. Supp. 2d 92, 99 (D.D.C. 2007).

The regulations governing ECOA define a "credit transaction" as "every aspect of an applicant's

dealings with a creditor regarding an application for credit or an existing extension of credit

(including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit; and collection procedures)." 12 C.F.R. § 202.2(m).

ECOA prohibits disparate treatment, which occurs when the defendant has "'treated [a] particular person less favorably than others because of' a protected trait." Ricci v. DeStefano, 557 U.S. 557, 577 (2009) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985-86 (1988)). Because Title VII of the Civil Rights Act of 1964 also prohibits disparate treatment, courts frequently interpret ECOA with reference to Title VII and the case law applying Title VII in employment discrimination cases. See Garcia v. Johanns, 444 F.3d at 631 n.7 ("[C]ourts have used Title VII precedent in cases involving ECOA."); see also Presidential Bank, FSB v. 1733 27th St. SE LLC, 404 F. Supp. 3d 1, 8-9 (D.D.C. 2019). This Court therefore will rely, in part, on Title VII case law to analyze Mr. Bradshaw's legal arguments.

"Proof of discriminatory motive is critical" for disparate treatment claims. Anderson v. Zubieta, 180 F.3d 329, 338 (D.C. Cir. 1999) (quoting Int'l Bd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)). A plaintiff need not, however, "present direct evidence of discriminatory intent." Davis v. District of Columbia, 949 F. Supp. 2d 1, 8 (D.D.C. 2013). A plaintiff may instead rely on circumstantial evidence that "permits an inference of discrimination." Holcomb v. Powell, 433 F.3d 889, 899 (D.C. Cir. 2006). "Proof that the defendant's explanation [for the challenged action] is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000). Comparator evidence that white farmers in the same geographic area received more favorable treatment "is

[also] relevant and fairly could support an inference of discrimination." Hildebrandt v. Vilsack, 102 F. Supp. 3d 318, 326 (D.D.C. 2015).

   Under Title VII, a plaintiff may pursue "a 'single-motive' or 'pretext' theory of discrimination, which requires him to prove the employer's improper consideration of a protected characteristic was a but-for cause of an adverse employment decision." Mayorga v. Merdon, 928 F.3d 84, 89 (D.C. Cir. 2019) (citing 42 U.S.C. § 2000e-2(a)(1)). "Alternatively, a plaintiff may advance a 'mixed-motive' theory of liability . . . , which allows a plaintiff unable to establish but-for causation to prevail as long as he can show that unlawful discrimination was 'a motivating factor' for the decision." Id. (citing 42 U.S.C. § 2000e-2(m)); see Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 343 (2013) (stating that under the mixed-motive theory of liability, the plaintiff must show "that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision").

   Although the D.C. Circuit has described these methods as "'alternative ways of establishing liability,' a plaintiff may proceed under both theories simultaneously." Ponce v. Billington, 679 F.3d 840, 845 (D.C. Cir. 2012). If a plaintiff "argues his case as a single-motive claim," however, "he bears the burden of showing the alleged animus was a but-for cause of the decision not to promote him." Mayorga v. Merdon, 928 F.3d at 95; cf. Nuskey v. Hotchberg, 730 F. Supp. 2d 1, 4 (D.D.C. 2010) (holding that the Court need only resolve whether the evidence supports a "single motive" theory or a "mixed motive" theory "after both sides have presented their cases . . . and the Court has evaluated the evidence") (emphasis added).

Because ECOA, like Title VII, prohibits status-based discrimination and is regularly analyzed with reference to Title VII case law, the Court concludes that liability under ECOA likewise can be established through either single-motive or mixed-motive theories of liability.  If an ECOA plaintiff argues his case under the single-motive theory of liability, however, "he bears the burden of showing the alleged animus was a but-for cause" of the unfavorable credit transaction.  See Mayorga v. Merdon, 928 F.3d at 95.

"Because direct evidence of an employer's discriminatory motives is often elusive, a plaintiff typically establishes but-for causation using the familiar pretext framework established in McDonnell Douglas Corp. v. Green . . . ."  Ponce v. Billington, 679 F.3d at 844. Once the defendant has "asserted a legitimate, non-discriminatory reason for an adverse . . . action," however, the inquiry into the *prima facie* case becomes "a largely unnecessary sideshow."  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).  At that point, a court's focus should instead be on the straightforward factual inquiry of whether the defendant intentionally discriminated against the plaintiff.  See U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983).

A plaintiff can attempt to show that the defendant's stated reason for the challenged action was a pretext for discrimination.  Often, the plaintiff "attempts to produce evidence suggesting that the [defendant] treated other [applicants] of a different race . . . more favorably in the same factual circumstances."  Brady v. Off. of Sergeant at Arms, 520 F.3d at 495.  Alternatively, the plaintiff "may attempt to demonstrate that the [defendant] is making up or lying about the underlying facts that formed the predicate for the [credit transaction] decision.  If the [defendant's] stated belief about the underlying facts is reasonable in light of the

evidence, however, there ordinarily is no basis for permitting a [the factfinder] to conclude that the employer is lying about the underlying facts." Id.

The Court therefore now turns to the evidence adduced at trial to determine whether Mr. Bradshaw carried his burden to prove that he was discriminated against with respect to a credit transaction – here, non-approval of a loan application – because of his race. See U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. at 715 ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'") (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981)); see also Williams v. Vilsack, 620 F. Supp. 2d 40, 47-48 (D.D.C. 2009)

### B.  FSA Did Not Discriminate on the Basis of Race

Mr. Bradshaw attempts to prove that FSA failed to approve his 2002 application on the basis of his race. Mr. Jurey, however, maintains that he closed the file on Mr. Bradshaw's application because Mr. Bradshaw never submitted the required paperwork, did not call or write saying he intended to do so, and did not otherwise follow up regarding the loan. In response, Mr. Bradshaw attempts to show that Mr. Jurey's explanation is simply a pretext for discrimination.

The Court does not credit Mr. Bradshaw's testimony over the contrary credible evidence introduced by USDA. It concludes that Mr. Jurey's explanation for non-approval of the loan is credible:  the loan was not approved because the paperwork was never completed. This is a legitimate, non-discriminatory, and non-pretextual reason. Mr. Bradshaw therefore has failed to show that he was discriminated against on the basis of his race with respect to the non-approval of his loan application.

1.  No evidence of racial animus

The Court need not decide whether Mr. Bradshaw proceeded under a

single-motive or mixed-motive theory of liability, because under either theory, he fails to show

that racial animus in any way motivated the non-approval of his loan.  See Mayorga v.

Merdon, 928 F.3d at 89.  Mr. Bradshaw presented no evidence that Mr. Jurey bore any racial

animus toward Mr. Bradshaw, nor did he present evidence that Mr. Jurey failed to approve

the 2002 application because of Mr. Bradshaw's race.

The record shows that, in all of his interactions with Mr. Bradshaw, Mr. Jurey

went above and beyond in order to assist Mr. Bradshaw.  When Mr. Bradshaw's file was

transferred to Mr. Jurey, FSA regulations required Mr. Jurey to send Mr. Bradshaw a notice of

intent to accelerate delinquent loans.  Rather than doing so, however, Mr. Jurey sent Mr.

Bradshaw a letter explaining ways FSA could assist Mr. Bradshaw.  See J. Ex. 25 at B000453.

Moreover, although it was not his responsibility to do so, Mr. Jurey investigated the

discrepancies on Mr. Bradshaw's credit report to ensure that those discrepancies would not make

Mr. Bradshaw ineligible for the loan.  See J. Ex. 16 at B001669; J. Ex. 25 at B000423.  During

March 2003, he spoke with Mr. Bradshaw four or five times per week in an effort to find a

positive cash flow.  Trial Tr. at 72:10-15 (Bradshaw); Stip. No. 20.  Mr. Jurey also repeatedly

adapted and updated the Farm and Home Plan in response to feedback from Mr. Bradshaw and

Mr. Jurey's own considerations of what would be most beneficial to Mr. Bradshaw.  See

J. Ex. 25 at B000433-34; Trial. Tr. 8/3/18 at 806:18-25 (Jurey).

In his April 10, 2003 letter formally denying Mr. Bradshaw's loan application,

Mr. Jurey stated that he would continue to work on the application and that he believed they

were "close to accomplishing this."  J. Ex. 13 at B001674.  And the evidence shows that he did

continue to "continue to work with" Mr. Bradshaw on the application.  Id.; see J. Exs. 14-17, 25 at B000423; D. Exs. 10-11.  Finally, Mr. Jurey did not consider the matter closed until October 16, 2003 – many months after mailing the Farm and Home Plan to Mr. Bradshaw.  See J. Ex. 21.  There is every reason to believe that Mr. Jurey would have continued to work on the application had Mr. Bradshaw inquired about the forms or about FSA's apparent inaction at any time between May 14 and October 16 – a period during which Mr. Bradshaw spoke with Mr. Jurey many times.  See D. Ex. 1 at 5.

Mr. Jurey's encouragement, as well as his continued efforts to craft a feasible plan, undermine any suggestion of discriminatory intent.  Had Mr. Jurey wanted to stymie Mr. Bradshaw's application, he could have done so any number of times.  Instead, the record reflects that Mr. Jurey sought to aid Mr. Bradshaw in any way possible.  Moreover, the evidence establishes that Mr. Jurey did not harbor racial animus toward Mr. Bradshaw.  Mr. Campbell stated:  "Dwight is—I have never heard the man use a disparaging word against anyone, engage in any kind of water cooler talk, gossip, anything of the kind about employees or borrowers or anyone else.  It's just not within the man's character."  Trial Tr. at 559:9-12 (Campbell).  And Mr. Jurey himself testified that denying a loan or loan servicing on the basis of race would be "wrong."  Id. at 663:2 (Jurey).  He stated that he "follow[s] the teachings of the Bible, and it teaches we should love others as ourselves, we should do unto others as we would have them do unto us."  Id. at 2-4 (Jurey).  Finally, he noted that denying a loan based on race "would be a violation of USDA and federal government regulations and laws that are designed to protect people's civil rights."  Id. at 5-7 (Jurey).  The Court cannot reconcile this credible testimony with Mr. Bradshaw's theory of unlawful race-based discrimination.

2.  Paperwork was not submitted or received

The weight of evidence at trial demonstrated that the sole reason Mr. Bradshaw's application received no further processing after May 2003 was his own failure to submit the required paperwork or otherwise inform FSA that he still wished to pursue the loan.

Mr. Bradshaw received Mr. Jurey's April 18, 2003 letter proposing a positive cash flow.  See Trial Tr. at 85:17-21 (Bradshaw).  He then requested some changes to that proposal.  Id. at 86:16-23 (Bradshaw).  Thereafter, Mr. Jurey revised and updated the balance sheet and sent Mr. Bradshaw a letter stating that he would send a corrected version of the Farm and Home Plan shortly.  Id. at 88:3-22 (Bradshaw).  Mr. Bradshaw also received Mr. Jurey's April 25, 2003 letter, to which an updated Farm and Home plan was attached.  Id. at 88:23-89:3. It is undisputed that Mr. Bradshaw understood that he would need to sign and submit the Farm and Home Plan and provide a copy of his 2002 tax return in order to proceed with the application.  Id. at 89:18-25 (Bradshaw).  But the evidence established that Mr. Jurey did not finalize Mr. Bradshaw's application because Mr. Jurey never received the required documents – a signed Farm and Home Plan and Mr. Bradshaw's 2002 tax return.  See J. Ex. 25 at B000420-21; J. Exs. 19, 22; Trial Tr. at 721:23-723:13 (Jurey); Trial Tr. 161:19-162:5 (Bradshaw).  Nor did Mr. Bradshaw give Mr. Jurey a clear indication that Mr. Bradshaw wished to pursue his application after Mr. Jurey crafted a feasible loan package.  See id. at 721:24-722:10 (Bradshaw).

Mr. Bradshaw offered no evidence at trial to rebut this reasonable explanation credibly made through Mr. Jurey's testimony and corroborated by contemporaneous emails and notes to the file.  At trial, Mr. Bradshaw testified that he mailed his 2002 tax return within one week after he filed it.  Trial Tr. at 90:15-17, 100:21-101:4 (Bradshaw).  He also testified that he

mailed the signed Farm and Home Plan not "too long" after receiving the April 25, 2003 letter. See id. at 98:11 (Bradshaw). But Mr. Jurey testified that he never received these documents id. at 722:11-723:13 (Jurey). Mr. Bradshaw conceded that he has no proof that he sent the documents or that Mr. Jurey received them. Id. at 161:19-162:5 (Bradshaw). And both he and Mr. Jurey testified that there was no discussion of his mailing or Mr. Jurey's receiving these documents in any of their many subsequent phone calls. See id. at 153:17-154:7 (Bradshaw); id. at 722:4-723:4 (Jurey).

To the contrary, Mr. Jurey's running record and contemporaneous emails noted that during his phone calls with Mr. Bradshaw on April 29, 2003 and May 14, 2003 – after Mr. Bradshaw says he mailed the documents – Mr. Bradshaw stated that he had not yet signed the documents because he first wanted to review them with his attorney. J. Ex. 25 at B000420-21. At trial, Mr. Bradshaw denied that he ever discussed his attorney, James Myart, with Mr. Jurey. Trial Tr. at 158:14-17 (Bradshaw). He also denied that he discussed his 2002 application with Mr. Myart. Id. at 103:11-104:10 (Bradshaw). The Court does not credit these denials. The record is replete with evidence that Mr. Myart was involved in Mr. Bradshaw's dealings with FSA from, at latest, the end of April 2003. See, e.g., D. Exs. 13, 94 at B006640; J. Ex. 24. And the Court finds that Mr. Jurey would have no reason to create fictitious records concerning phone conversations about Mr. Myart and report them to his superiors. The only reasonable conclusion is that Mr. Bradshaw's own statements in the telephone conversations on April 29 and May 14, 2003 – as contemporaneously recorded by Mr. Jurey – contradict his testimony at trial that he mailed the documents before the end of April 2003.

Furthermore, the evidence at trial showed that, on numerous occasions after receiving Mr. Jurey's April 25, 2003 letter, Mr. Bradshaw called Mr. Jurey or other FSA

personnel to discuss various transactions.  See generally D. Ex. 1.  And after May 14, 2003, Mr.

Bradshaw called Mr. Jurey at least three more times to discuss issues related to the application.

See J. Ex. 25 at B000419-20; D. Ex. 97.  But in none of these conversations did Mr. Bradshaw

say that he wished to pursue the 2002 application.  Nor did he inquire about the application in

any letters or phone conversations later that year.  See Trial Tr. at 153:17-21 (Bradshaw).  In a

letter to Mr. Bradshaw in 2004, Mr. Jurey explained his reason for suspending the 2002

application:  "I was unable to continue processing the proposed subordination and debt

restructure because you did not sign the Farm & Home Plan and provide copies of your 2002 tax

return."  D. Ex. 17 at B000305.  Over the next several years, Mr. Jurey sent at least two more

letters to Mr. Bradshaw that included a similar explanation regarding his reason for suspending

Mr. Bradshaw's 2002 application.  See D. Ex. 23 at B002887; D. Ex. 24 at B003412.  Even after

receiving those unambiguous letters, Mr. Bradshaw never discussed the issue with Mr. Jurey or

expressed a different view about what had transpired or might have caused the application to

stall.  The first time that Mr. Bradshaw ever stated that he had signed and mailed these forms was

at his deposition in January 2014, over a decade after the events in question.  See Compl.; 2d

Am. Compl. ¶ 21; D. Exs. 37, 41; J. Ex. 43 at 175:16-177:11.  The Court finds that Mr.

Bradshaw has failed to prove that he ever mailed his 2002 tax return and the signed Farm and

Home Plan.

       Even if the Court were to credit Mr. Bradshaw's testimony that he mailed the

Farm and Home Plan and 2002 tax return to Mr. Jurey, the Court would have no basis to

conclude that FSA received the forms.  The "common law mailbox rule" states "that proof that a

letter has been properly addressed, stamped, and deposited in the mail gives rise to a rebuttable

presumption that the letter was delivered in a timely fashion to its intended recipient."

Duckworth v. United States ex rel. Locke, 705 F. Supp. 2d 30, 42 (D.D.C. 2010).  But the presumption of receipt in a particular case may be rebutted by "sworn testimony or other admissible evidence" to refute the receipt of a letter.  Hammel v. Marsh USA Inc., 79 F. Supp. 3d 234, 243 (D.D.C. 2015).  A "party's unadorned assertion that he does not remember receiving a letter mailed to his address in insufficient to rebut the presumption."  Momenian v. Davidson, Civil No. 1:15-cv-00828, 2020 WL 999204, at *5 (D.D.C. Mar. 1, 2020).  But "[i]f the opponent does offer some evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the (factfinder's) hands free from any rule."  Canales v. A.H.R.E., Inc., 254 F.R.D. 1, 4-5 (D.D.C. 2008) (quoting Legille v. Dann, 544 F.2d 1, 5-6 (D.C. Cir. 1976) (holding that a registered agent's testimony denying receipt overcame the presumption)).

At trial, the USDA presented evidence sufficient to overcome the mailbox rule presumption.  Mr. Jurey kept excellent records and logged all communications either in his running record or in Mr. Bradshaw's borrower file.  See, e.g., Trial Tr. at 554:4-12 (Campbell) ("Dwight had a reputation for crossing T's and dotting I's, sometimes twice, and probably the best kept file and records and narratives that we saw in the agency.  His office received a number 1 rating, the first ever in the State of Kansas, in what is called Farm Loan Program Review. . . .  There wasn't one error found in lack of documentation or recordkeeping or service to clients."); id. at 665:7 to 666:7 (Jurey) (testifying about the running record and borrower file).  Moreover, Mr. Bradshaw has no evidence that he ever sent the documents.  See id. at 161:19-162:5 (Bradshaw).

The evidence about Mr. Jurey's meticulous recordkeeping, coupled with Mr. Bradshaw's lack of evidence that he mailed his documents to FSA, is sufficient to rebut any

presumption of delivery or receipt.  See Austin Inv. Fund, LLC v. United States, 304 F.R.D. 5, 9

(D.D.C. 2014) (concluding, based on declarations of the intended recipient and his assistant, that

the document "was never received at the [relevant] address"); Canales v. A.H.R.E., Inc., 254

F.R.D. at 5 (D.D.C. 2008) (holding that "affidavit averring that [defendant's registered agent]

never received any notice" was "sufficient evidence to rebut the presumption of delivery").  The

Court concludes that the required documents were never received by Mr. Jurey, and that this is a

credible explanation for the suspension of Mr. Bradshaw's 2002 application.

### 3.  USDA's Proffered Explanation is Not Pretextual

At trial, Mr. Bradshaw argued that the USDA's alleged non-receipt of the loan

paperwork was a pretext for discrimination.  He attempted to support this argument by

presenting evidence that:  (1) Mr. Jurey was aware of and periodically reviewed the status of

Mr. Bradshaw's Pigford claim; (2) white farmers received preferential treatment from Mr. Jurey;

and (3) two FSA employees outside of Mr. Jurey's command – Arlyn Stiebe and Mark

Hendrickson – exerted influence on the application process.  The Court concludes that this

evidence is not persuasive and does not establish discriminatory intent on the part of Mr. Jurey or

FSA.

### a.  Tracking of Mr. Bradshaw's Pigford Claim

Throughout trial, Mr. Bradshaw repeatedly drew the Court's attention to evidence

showing that Mr. Jurey monitored the status of Mr. Bradshaw's Pigford claim.  During closing

argument, counsel for Mr. Bradshaw surmised that the "only inference to be drawn is that FSA

was looking at Mr. Bradshaw's *Pigford* claim . . . because they wanted to foreclose."  Trial Tr.

at 870:12-15 (closing argument); see also id. at 870:21-25 ("Mr. Hendrickson said to Mr.

Bradshaw that he had a hand in putting Mr. Bradshaw's grandmother out of business, and the FSA was trying to do the same thing to Mr. Bradshaw.  The easiest way to put a farmer out of business is to foreclose on their land because you can't farm land you don't have.").

The Court does not credit this speculation about FSA's intentions.  Mr. Jurey credibly testified as to why he needed to stay apprised of the status of Mr. Bradshaw's Pigford claim:  "I would have needed to know when [Mr. Bradshaw] was finished with the consent decree so that I would know what action to take next, meaning sending [a] primary loan servicing notice."  Trial Tr. at 671:20-22 (Jurey).  Mr. Jurey stated that if Mr. Bradshaw had received relief under the Pigford consent decree, "he would have received forgiveness of FSA debt," id. at 710:12-13, but if his Pigford claim were denied, he would have received another opportunity for primary loan servicing before foreclosure proceedings continued, id. at 711:5-14.  Mr. Jurey's testimony is corroborated by USDA Notice FLP-279, which explains that unsuccessful Pigford claimants "who are financially distressed or delinquent on their FSA farm loan program loans, but not yet accelerated," would have "another opportunity to apply for loan servicing programs."  J. Ex. 44 at B001842.  In other words, a change in Mr. Bradshaw's Pigford status could have accorded him new procedural rights or opportunities.  See also Trial Tr. at 507:7-12 (Stiebe) (agreeing that FSA would not proceed with foreclosures "so long as someone was pursuing his remedies under the [Pigford] consent decree").

Mr. Jurey's testimony that he needed to know the status of the Pigford claim to determine what options might be available to Mr. Bradshaw is consistent with Mr. Jurey's general approach to Mr. Bradshaw's loan applications:  Mr. Jurey worked hard to devise credit solutions for Mr. Bradshaw, notwithstanding Mr. Bradshaw's severe financial difficulties and his refusal to make voluntary payments toward his delinquent FSA debt.  The Court concludes that

Mr. Jurey's monitoring of Mr. Bradshaw's <u>Pigford</u> claim is not evidence of race-based discrimination.

b.  Similarly Situated White Farmers

Mr. Bradshaw contends that there were fifteen similarly situated white farmers who sought loans between 2002 and 2005 and whom Mr. Jurey treated more favorably than he treated Mr. Bradshaw.  <u>See</u> Pl. Ex. 1.  The Court concludes that this proposed comparator evidence does not support an inference of discrimination by FSA.

One common way "to discredit [a defendant's] justification [for a challenged action] is to show that similarly situated [borrowers] of a different race received more favorable treatment."  <u>Wheeler v. Georgetown Univ. Hosp.</u>, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (citation omitted); <u>see also</u> <u>Hildebrandt v. Vilsack</u>, 102 F. Supp. 3d at 326 ("[A]t least one category of evidence cited by the Hildebrandts—specifically, the apparent disparity between them and those white farmers who did receive loan applications from FSA—could support a finding that FSA's alleged refusal to provide applications to the Hildebrandts was due to their race.").  Whether two persons are similarly situated is "ordinarily a question of fact."  <u>Wheeler v. Georgetown</u>, 812 F.3d at 1116.  And, in the Title VII context, "[f]or employees to be similarly situated, all of the relevant aspects of their employment situations must be nearly identical."  <u>Evans v. Holder</u>, 618 F. Supp. 2d 1, 11 (D.D.C. 2009) (internal quotation marks and citations omitted). Importantly, however, the "similarly situated inquiry is not a mechanical comparison, but requires enough common factors to determine if intentional discrimination was at play."  <u>Burton v. District of Columbia</u>, 153 F. Supp. 3d 13, 67 (D.D.C. 2015), <u>aff'd</u> <u>sub</u> <u>nom</u>. <u>Nelson v. District of Columbia</u>, 689 F. App'x 642 (D.C. Cir. 2017) (internal quotation marks and citation omitted). "It suffice[s] to show that the plaintiff[s] and the comparator were 'similarly situated in all

65

material respects' – not in all respects." <u>Johnson v. U.S. Capital Police Bd.</u>, No.

Civ. A. 03-00614, 2005 WL 1566392, at *3 (D.D.C. July 5, 2005) (citation omitted).

Factors that might be considered material in the context of this case include

application date, type of loan, plaintiff's credit situation, plaintiff's type of farm operation, the

decision-maker, and whether the application was complete when submitted.  <u>See</u> <u>Williams v.</u>

<u>Vilsack</u>, 620 F. Supp. 2d 40, 50 (D.D.C. 2005) (concluding that an individual was an improper

comparator because he applied for a different loan in a different year and was denied by a

different decisionmaker); <u>see id</u>. at 50 n.6 ("Plaintiffs proffer no evidence that this farmer's

credit situation and farm operation were similar to that of Plaintiffs by showing that he omitted

debts from his loan application or proposed an operation that was not feasible.").  <u>Cf</u>. <u>Wheeler v.</u>

<u>Georgetown</u>, 812 F.3d at 1116 ("Factors that bear on whether someone is an appropriate

comparator include . . . whether they were disciplined by the same supervisor . . . .");  <u>White v.</u>

<u>Tapella</u>, 876 F. Supp. 2d 58, 70 (D.D.C. 2012) ("And in order to establish valid comparator

evidence, the plaintiff must point to a similarly situated employee outside of a protected class

who committed comparable offenses but who was punished less severely by the same deciding

official.").  And "[w]hile no numerosity requirement applies to comparators, such that a single

comparator may suffice to support an inference of discrimination, the degree of similarity

necessary may vary in accordance with the size of the potential comparator pool, as well as to the

extent to which the plaintiff cherry-picks would-be comparators."  <u>Burton v. District of</u>

<u>Columbia</u>, 153 F. Supp. 3d at 67 (internal quotation marks and citation omitted).

The Court concludes that the comparator evidence in this case is not probative for

three reasons.  First, the summary chart introduced at trial is incomplete.  It omits transactions in

the time period from 2002 to 2005 in which loan requests by white farmers <u>were not</u> finalized or

approved and transactions in which Mr. Bradshaw's loan requests <u>were</u> finalized or approved. <u>Compare</u> P. Ex. 1 <u>with</u> P. Ex. 16. The chart has twenty-three rows highlighted in green, reflecting loan applications by white farmers and one row highlighted in red reflecting Mr. Bradshaw's 2002 application. At first glance, the chart appears to show that Mr. Bradshaw was treated differently by FSA. But the testimony at trial belies that initial impression.

Alicia Balthazar, a paralegal employed by plaintiff's counsel, created and populated the summary chart. Ms. Balthazar acknowledged on cross-examination that Mr. Bradshaw applied for other loans between 2002 and 2005, but that she "was not instructed to include them." Trial Tr. at 395:23-396:2 (Balthazar). Ms. Balthazar also testified that "there were some applications" by white farmers "where they were denied, but again, [she] was not asked to put that in the chart." <u>Id</u>. at 396:10-12 (Balthazar). In other words, plaintiff "cherry-picked" particular transactions in order to draw comparisons between himself and white farmers. <u>Cf</u>. <u>Burton v. District of Columbia</u>, 153 F. Supp. 3d at 67. This is evidenced by the fact that the chart includes only loan applications submitted before January 13, 2005, despite the fact that Mr. Bradshaw submitted four more applications later in 2005. <u>See</u> D. Ex. 1 at 7; D. Ex. 2, Rows 2-5. It is further evidenced by the fact that some loans in plaintiff's exhibit 16 are excluded from plaintiff's exhibit 1. <u>Compare</u> P. Ex. 1 <u>with</u> P. Ex. 16. The exclusion of these other applications submitted by Mr. Bradshaw and the white farmers reduces the evidentiary value of the summary chart because it fails to paint an accurate picture of FSA's decision-making from 2002 to 2005.

Second, two of the purported comparator transactions provide no basis for comparison because the loans were not recommended or approved by Mr. Jurey. Farmer F's January 5, 2004 application was recommended for approval by a farm loan manager named Jane

Laib and approved by Mr. Stiebe.  Trial Tr. at 766:1-18 (Jurey).  And Farmer G's

January 12, 2005 application was recommended for approval by a farm loan manager named

Randall Theil and approved by Dean Altenhofen, a farm loan specialist in the state office.  Id.

at 768:8-770:6 (Jurey).  Mr. Bradshaw's inclusion of these loans, the approvals of which did not

involve Dwight Jurey, further undermines the evidentiary value of his chart and the viability of

his comparator theory.

     Third, any different treatment Mr. Bradshaw received was a result of a significant

material difference in his circumstances as compared to white farmers.  The white farmers were

similar to Mr. Bradshaw in that they each had at least one loan application for which a positive

cash flow could be projected.  See P. Ex. 16 (showing loans approved and closed for each white

farmer); Trial Tr. at 459:6-17 (Stiebe) (testifying that a farmer must have a positive cash flow to

receive a loan).  Most of those loan applications were eventually approved, which differentiates

them from Mr. Bradshaw's 2002 application.  But Mr. Bradshaw has not shown that any of the

white farmers' loans were approved after they failed to submit the required paperwork.  This is a

material difference between Mr. Bradshaw and the other farmers, and it ultimately dooms his

attempted comparison.  FSA had reason to know that the other farmers were pursuing their

applications, whereas Mr. Jurey had no reason to know that Mr. Bradshaw was still interested in

pursuing his application.  The Court cannot draw an inference of discrimination by comparing

farmers who differed in this fundamental way.  See, e.g., Burley v. Nat'l Passenger Rail

Corp., 801 F.3d 290, 301 (D.C. Cir. 2015) (rejecting alleged comparators because they had not

engaged in the same rules violations that would have increased their culpability); Williams v.

Vilsack, 620 F. Supp. 2d at 50 n.6 (rejecting potential comparator as dissimilar because plaintiff

did not "show[] that [the comparator] omitted debts from his loan application or proposed an

operation that was not feasible"). Instead, the only farmers to whom Mr. Bradshaw could be fairly compared are those who did not submit a completed application: Farmers C, J, and L. See P. Ex. 16. But those applications by Farmers C, J, and L were withdrawn as incomplete, similar to Mr. Bradshaw's 2002 application. The Court therefore concludes that Mr. Bradshaw's comparator evidence fails to show that FSA's proffered explanation for the loan non-approval was pretextual.

Finally, the evidence does not show that Mr. Bradshaw was treated substantially differently from the white farmers. For instance, like Mr. Bradshaw, Farmers C, J, and L each had one application that was withdrawn because it was incomplete. P. Ex. 16 at 1-2. Similarly, Mr. Bradshaw and Farmers D, G, and L all had loans that were not approved for failure to project positive cash flow. Id. at 1. Farmers D, G, H, K, and L each had at least one application denied. Id. at 1-3. And Farmer I had one application approved only in part. Id. at 4. The comparator evidence therefore shows that other farmers had mixed success securing loans, even during the limited period from October 23, 2002 to January 12, 2005.

### c. Alleged "Influence" Exerted by Other Officials

At trial, Mr. Bradshaw attempted to show that Farm Loan Chief Arlyn Stiebe and District Director Mark Hendrickson were racially biased against him and influenced Mr. Jurey to improperly deny the application. The USDA suggests that in order to consider this argument, the Court must apply the so-called "cat's paw" theory of liability. The Court disagrees.

Cat's paw liability, which has traditionally been applied in the Title VII employment discrimination context, holds an employer liable for discriminatory acts by an employee's direct supervisor, even where that supervisor is not the ultimate decisionmaker, if the "supervisor performs an act motivated by [discriminatory] animus that is *intended* by the

supervisor to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action." Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011).  Generally, the theory applies where a supervisor who is in direct contact with the employee holds racial animus toward the employee and that animus influences the ultimate decisionmaker, usually a higher-level official, to take an adverse action against the employee.  See, e.g., Morris v. McCarthy, 825 F.3d 658 (D.C. Cir. 2016) (plaintiff alleged that supervisor influenced deputy chief of staff's decision to suspend her); Uzoukwu v. Metro. Wash. Council of Gov'ts, No. 11-cv-00391, 2016 WL 471269 (D.D.C. Feb. 8, 2016) (plaintiff alleged that supervisor and former department director influenced executive director's decision to fire her); Gibbs v. Wash. Metro. Area Transit Auth., 48 F. Supp. 3d 110 (D.D.C. 2014) (plaintiffs alleged that first-line supervisor influenced general superintendent's decision to fire them).

In this case, by contrast, Mr. Bradshaw attempts to prove that the higher-level officials, Mr. Stiebe and Mr. Hendrickson, influenced a lower-level official, Mr. Jurey.  The argument therefore is an ill fit to the cat's paw liability framework.  Moreover, neither party has cited to, nor can the Court find, any cases applying cat's paw liability to an ECOA claim.  Rather than attempting to shoehorn Mr. Bradshaw's argument into a cat's paw liability framework, therefore, the Court will simply consider whether the conduct or attitudes of Mr. Stiebe and Mr. Hendrickson serve as circumstantial evidence that supports an inference of race-based discrimination by Mr. Jurey.  See Holcomb v. Powell, 433 F.3d 889, 899 (D.C. Cir. 2006) (stating that a plaintiff may rely on circumstantial evidence to show race-based discrimination).

i. Arlyn Stiebe

Mr. Stiebe consistently demonstrated an interest in FSA providing full and fair consideration of Mr. Bradshaw's application.  For example, when Mr. Bradshaw requested that

his loan file be transferred away from the office overseen by Mr. Hendrickson, Mr. Stiebe recommended that the file be transferred.  See Trial Tr. at 467:6-468:1, 514:4-13 (Stiebe).  Mr. Stiebe also commended Mr. Jurey for the time and energy he had put into assisting Mr. Bradshaw with his application.  D. Ex. 8 ("I want to commend you for all of the effort you have put into this case to try and find a workable solution.").  These actions and comments cannot be reconciled with a theory of racial animus toward Mr. Bradshaw.

Moreover, at trial, Mr. Stiebe credibly testified that there are no circumstances in which it would be appropriate for FSA to decline to offer a loan or loan servicing to an applicant because of that applicant's race.  Trial Tr. at 460:20-23 (Stiebe).  He also testified that, when he learned in 2002 of Mr. Bradshaw's interest in submitting the loan application that ultimately became the subject of this dispute, his expectation was that Mr. Jurey would assist Mr. Bradshaw in completing the application.  See id. at 4849:25-480:7 ("[A]nytime we received an application, it is our job, and it is required that we work through it, just like we would anybody else's loan.").  Finally, Mr. Stiebe credibly testified that he did not treat Mr. Bradshaw differently after receiving an improper demand from Mr. Bradshaw's attorney regarding administrative offsets.  Id. at 482:7-9.

On cross-examination, Mr. Bradshaw's counsel posed questions concerning email exchanges Mr. Stiebe had with Mr. Jurey in an effort to show that Mr. Stiebe harbored racial animus toward Mr. Bradshaw.  Counsel asked about one email exchange in March 2005 where Mr. Jurey and Mr. Stiebe, along with Mr. Campbell, discussed the options Mr. Jurey might have in processing a hypothetical loan application that Mr. Bradshaw had indicated he would file.  See D. Ex. 18 at B000265; D. Ex. 26 at B000411; Trial Tr. at 540:8-17 (Stiebe) (confirming that the application in question was a hypothetical application that had not been filed).  The exchange

occurred because Mr. Bradshaw had threatened to file a subordination application just to see how long it would take FSA to process it and to contact a Congressional committee if it took longer than 15 days. See D. Ex. 18 at B000265. Mr. Campbell advised Mr. Jurey of the following:

> We will follow the regulations on approving and withdrawing applications. If we get a complete application by deadlines provided in the regulations, we'll work to meet or beat the Kansas AVERAGE timeframe of 18 days. If negotiations are required to move toward approval of a subordination then this may delay our processing, but I can't see rejecting the application on this basis alone. We would not typically reject other applications given similar circumstances. We will give everyone equal treatment, particularly SDA applicants, no more no less.

D. Ex. 18. After speaking with a representative from the FSA national office, however, Mr. Stiebe concluded that "it would be best to . . . approve or reject . . . [the application] based on the information available, and keep it moving." D. Ex. 304 at B007950. He also recommended that "if it was going to take time to work with other lenders for Mr. Bradshaw, [Mr. Jurey] should not do that." Id. at 523:1-18 (Stiebe). He acknowledged that "this will result in a rejection, but we will have done it timely." D. Ex. 304 at B007950.

The Court concludes that this conversation is not evidence of racial bias. Rather, it is evidence, at most, of FSA personnel's desire to avoid repeating the same labor-intensive process in which Mr. Jurey engaged but that Mr. Bradshaw ultimately did not take advantage of in 2002. The Court cannot conclude from this exchange that Mr. Stiebe bore racial animus toward Mr. Bradshaw. Moreover, this exchange occurred almost three years after Mr. Bradshaw had submitted his loan application, and it occurred one-and-a-half years after Mr. Jurey had already marked the application suspended because of Mr. Bradshaw's failure to send the Farm and Home Plan and 2002 tax return. Even if the Court somehow were to conclude that Mr. Stiebe's recommendation demonstrated racial animus, therefore, it still could not conclude that

such animus infected a process that had ended almost two years prior.  Moreover, Mr. Stiebe, Mr. Jurey, and Mr. Campbell were discussing a <u>hypothetical</u> application that Mr. Bradshaw had stated he planned to file.  But when Mr. Bradshaw ultimately did file a subordination application, Mr. Jurey processed and approved that application.  <u>See</u> D. Ex. 2.  When Mr. Stiebe learned of Mr. Jurey's efforts related to this application, he wrote:  "Great job Dwight. Nobody can say you haven't given the application your full consideration and explored all options." D. Ex. 20.

The Court concludes that Mr. Stiebe's emails commending Mr. Jurey, as well as Mr. Stiebe's credible testimony at trial, refute Mr. Bradshaw's theory that Mr. Stiebe was trying to discourage Mr. Jurey from providing FSA services to Mr. Bradshaw.  Mr. Bradshaw has not offered sufficient evidence tending to show that Mr. Stiebe harbored racial animus against Mr. Bradshaw or that such animus influenced Mr. Jurey's actions with respect to the 2002 application.

### ii.  Mark Hendrickson

Mr. Hendrickson was the District Director who had been responsible for Mr. Bradshaw's loan accounts prior to the loan application at issue in this case.  As previously stated, however, Mr. Bradshaw's borrower files were transferred away from the office under Mr. Hendrickson's control in 2002.  Thereafter, although Mr. Hendrickson was kept informed of administrative offsets and loan servicing, he had no responsibility for Mr. Bradshaw's loans, loan applications, or loan servicing.  <u>See</u> Trial Tr. at 593:17-20; 595:21-596:2, 616:6-618:23 (Hendrickson).

Mr. Bradshaw testified that on multiple occasions Mr. Hendrickson had demonstrated racial animus toward him.  For example, he testified that in 1998, Mr. Hendrickson told him that he had driven Mr. Bradshaw's grandmother out of the farming business.  <u>See</u> Trial

Tr. at 121:7-11 (Bradshaw).  Mr. Bradshaw also testified that, on one occasion in 2008, Mr. Hendrickson used an offensive racial epithet and on a separate occasion, stuck up his middle finger at Mr. Bradshaw.  See id. at 126:1-19 (Bradshaw).  Mr. Hendrickson denied both accusations.  See id. at 600:9-21 (Hendrickson).

> The Court finds that Mr. Hendrickson's testimony is more credible on these points.  Mr. Bradshaw's grandmother died in 1983, but Mr. Hendrickson did not start working in Montgomery County until 1986.  Trial Tr. at 603:11-13 (Hendrickson).  He therefore could not have been involved in driving Mr. Bradshaw's grandmother out of business.  Mr. Hendrickson testified that he does not harbor racial prejudice and that there would be no circumstances in which it would be appropriate for FSA to decline to offer a loan to an applicant because of that applicant's race.  Id. at 601:10-16.  Mr. Hendrickson also testified that he is a close personal friend of Pastor Marc Bradshaw, Mr. Bradshaw's cousin and presumably also African American, and that in fact he is a member of Pastor Bradshaw's congregation.  Id. at 624:13-24.  Finally, other FSA witnesses testified that they had no reason to believe Mr. Hendrickson harbors any racial prejudice.  See id. at 487:9-11 (Stiebe); id. at 573:5-7 (Campbell); see also id. at 563:12-564:3 (Campbell); cf. Trial Tr. at 755:8-10 (Jurey) ("Q: Did Mark Hendrickson ever ask you not to finalize a loan for Mr. Bradshaw?  A: No.").

> On the basis of this testimony, the Court finds that Mr. Bradshaw failed to demonstrate racial animus on the part of Mr. Hendrickson.  Mr. Bradshaw's inaccurate memory of Mr. Hendrickson's comments concerning his grandmother calls into question the accuracy of his accounts of other interactions with Mr. Hendrickson.  And Mr. Hendrickson's close, personal relationship with another member of Mr. Bradshaw's family belies the conclusion that Mr. Hendrickson harbored racial animus against Mr. Bradshaw.  Because the Court concludes that

Mr. Bradshaw has not established racial animus on the part of Mr. Hendrickson, it further

concludes that Mr. Jurey could not have been influenced by any such animus.

   In sum, the Court rejects Mr. Bradshaw's contention that FSA's reason for its

handling of Mr. Bradshaw's 2002 application was pretextual, and it credits the USDA's

explanation for the challenged non-approval.  Cf. Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. at 147 (stating that a court can infer the fact of discrimination where it disbelieves

the defendant's explanation for the adverse action).  USDA asserts that it did not approve

the 2002 application because Mr. Bradshaw never sent the necessary paperwork.  The Court

concludes that this understanding of the facts is reasonable in light of the evidence.  See Brady v.

Office of Sergeant at Arms, 520 F.3d at 495.  The Court therefore concludes that discrimination

was not a motive in FSA's non-approval of Mr. Bradshaw's 2002 application.  Cf. Mayorga v.

Merdon, 928 F.3d at 89.  Mr. Bradshaw has failed to prove that he was discriminated against

with respect to the loan non-approval in violation of ECOA.

## C.  Plaintiff is Not Entitled to Damages

   Under ECOA, a successful litigant may seek "any actual damages sustained by

[the aggrieved] applicant," 15 U.S.C. § 1691e(a); "such equitable and declaratory relief as is

necessary to enforce [ECOA]," id. § 1691e(c); and "the costs of the action, together with a

reasonable attorney's fee," id. § 1691e(d).  Because Mr. Bradshaw has not prevailed on the

question of liability, he has no right to damages.

## III.  CONCLUSION

   As the finder of fact, the Court had the opportunity to hear the testimony of

witnesses and consider all the correspondence and other documents admitted in evidence.  It had

the opportunity to assess the credibility of the witnesses and to test Mr. Bradshaw's assertions

through the crucible of direct and cross-examination.  As the foregoing discussion of that evidence demonstrates, Mr. Bradshaw failed to prove his case at trial.  Judgment therefore will be entered for the USDA.

SO ORDERED.

_____

PAUL L. FRIEDMAN
United States District Judge

DATE:  September 2, 2021